2008 OK 70

**Phillip SCHOVANEC, Plaintiff/Appellant,**

**v.**

**ARCHDIOCESE OF OKLAHOMA CITY, Reverend Eusebius J. Beltran, Defendants/Appellees,**

**and**

**David B. Imming, Defendant.**

**No. 102,028.**

Supreme Court of Oklahoma.

July 1, 2008.

As Corrected July 2, 2008.

Douglas D. Wilguess, Oklahoma City, OK, for Plaintiff/Appellant.

Robert W. Nelson, Thomas A. Paruolo, Nelson, Roselius, Terry, O'Hara & Morton, Oklahoma City, OK, for Defendants/Appellees.

Douglas G. Eason, Lawrence & Eason, P.A., Oklahoma City, OK, for Defendants/Appellees.

EDMONDSON, V.C.J.

¶ 1 This case involves an action by a former parishioner against his former priest, archbishop, and diocese based upon allegations of predatory sexual misconduct by the priest against the parishioner and allegations that a former bishop and diocese failed to take appropriate actions against the priest. The District Court's summary judgment for the archbishop and diocese is affirmed in part and reversed in part. The judgment is reversed on claims made by the parishioner where reasonable minds could differ when considering evidentiary material facts relating to issues to be determined by the trier of fact.

¶ 2 In the District Court, Schovanec alleged that when he was a youth he was enticed, induced, directed, and/or coerced by Father Imming, his Roman Catholic priest and youth pastor, to engage in inappropriate conduct and sexual acts. He also alleged that the Archdiocese of Oklahoma City (Archdiocese) knew, or should have been aware, of the priest's history of inappropriate and criminal misconduct, and that the Archdiocese failed to protect the parishioners where the priest was assigned by the Archdiocese. Schovanec's claims are based upon theories of assault, battery, respondeat superior, vice principal liability, negligent supervision, negligent retention, breach of fiduciary duty, intentional infliction of emotional distress, negligent infliction of emotional distress, and civil conspiracy.

¶ 3 The Archdiocese and Archbishop Beltran filed two consecutive motions for summary judgment, which together addressed all of Schovanec's claims against the Archdiocese and the Archbishop.[1] Upon sustaining

---

1. The first motion and response addressed Scho- vanec's claims based upon theories of assault,

the second motion for summary judgment, the trial court determined that pursuant to 12 O.S. 994 no just reason existed for delay in filing a judgment as to the Archdiocese and Archbishop Beltran. Schovanec appealed and the Court of Civil Appeals affirmed the judgment.

¶ 4 Schovanec sought certiorari in this Court and argued that both the trial and appellate courts incorrectly applied legal principles relating to respondeat superior, negligent supervision, breach of a fiduciary duty, the doctrine of vice principal, and the nature of notice an employer must receive of an employee's predatory sexual conduct before legal liability is created. Schovanec also argued that the trial and appellate courts created a "willful blindness" defense for employers, and impermissibly shifted the duty of supervising clergy employees from the employer/Archdiocese to the parishioners. We granted certiorari and now address the arguments raised by the parties.

## I. *Respondeat Superior*

■ ¶ 5 Beltran and the Archdiocese argue that *respondeat superior* may not be used to hold a religious organization liable for an intentional tort by one of its clergy. *Respondeat superior* is a legal theory that holds an employer liable for the willful torts of an employee acting within the scope of employment in furtherance of assigned duties. *N.H. v. Presbyterian Church (U.S.A.)*, 1999 OK 88, ¶ 14, 998 P.2d 592, 598. In *N.H.* we stated that predatory sexual conduct by an ecclesiastical officer against a parishioner is an act that occurs outside the scope of the ecclesiastic's employment as a matter of law. *Id.* at ¶ 17, 998 P.2d at 599.

¶ 6 Although we spoke of sexual predatory conduct as outside the scope of employment as a matter of law, that language was based upon the fact that no reasonable person would conclude that predatory sexual conduct was part of, and in the furtherance of, the ecclesiastical organization's business. *Id.*

Schovanec must show a controversy relating to facts or inferences from facts that predatory sexual conduct occurs in furtherance of this particular ecclesiastical organization's business to make a respondeat superior claim that will survive the summary judgment process. Schovanec argues that "the fact that the abuse in this case occurred as the result of, and during counseling sessions, places Imming's conduct within the scope of employment with the OKC Archdiocese—or at a minimum, creates a question of fact on this issue which must be decided by the jury." (Sept. 13, 2004, response on summary judgment, 15). This Court rejected a similar argument in *N.H. v. Presbyterian Church (U.S.A.)*, *supra*, where we noted that the sexual predator had engaged in sexual abuse during church activities designed to recruit new members, and this fact was insufficient to show either that sexual abuse was fairly and naturally incident to the employer's business or that it occurred to complete the employer's business. *Id.* 1999 OK 88, ¶¶ 14–18, 998 P.2d 592, 598–600.

■ ¶ 7 In *N.H.* we noted that the religious organization condemned sexual molestation. *Id.* at ¶ 16, 998 P.2d at 599. Schovanec does not point to any fact indicating that the particular ecclesiastical denomination involved in this case, or Father Imming as its representative, utilized predatory sexual conduct as a means of advancing the denomination's business. Indeed, Schovanec's submissions of fact indicate that this particular ecclesiastical denomination condemns predatory sexual conduct, and Schovanec points to no fact indicating that such condemnation is a denominational sham. Schovanec points to no fact showing that a particular act of abuse by Father Imming against him furthered a particular denominational/religious goal or religious practice of the Archdiocese or the religion it practices. Schovanec thus does not have an action against Beltran and the Archdiocese based upon *respondeat superior*. We accordingly affirm the trial

battery, vice principal and respondeat superior. O.R. Vol. I, Tab 5 & Tab 6 The second motion addressed Schovanec's claims based upon theories of negligent retention and supervision, alleged breach of a fiduciary duty, civil conspiracy,

and negligent /intentional infliction of emotional distress. O.R. Vol. II, Tab 9, Defendants' motion and brief for summary judgment, Dec. 1, 2004. The trial court granted both motions for summary judgment.

court's summary judgment on Schovanec's claim of *respondeat superior*.

## II. Negligent Supervision and Retention

¶ 8 Schovanec argues that the trial and appellate courts did not recognize facts relating to the negligent retention and supervision of Father Imming by Archbishop Beltran and the Archdiocese. The Archdiocese and Archbishop state that they did not know, and did not have reason to know, of any allegations of improper sexual conduct by Father Imming prior to, or during, the time of Schovanec's alleged abuse, 1981–1986. They argue that this lack of knowledge defeats all of Schovanec's claims against them based upon a theory of negligent supervision. They additionally state that prior to 2002 "No layperson ever alleged or complained to the Archdiocese of Oklahoma City, its priests and/or Archbishop Beltran that Father Imming engaged in inappropriate sexual conduct with minors." (Dec. 1, 2004, motion and brief for summary judgment, 11–12.)

¶ 9 Schovanec argues that the Archdiocese was aware, prior to 1987, that Imming engaged in what the Catholic Church, the Catholic Bishops' Council and Oklahoma law define as sexual abusive conduct. Schovanec points to Imming's alleged conduct in skinny-dipping with minors, mutual back rubs with minors, providing alcohol to minors, allowing minors to stay overnight with him, taking minors on trips, and allowing a minor to live with him as conduct of which the Archdiocese either knew or should have known, and Schovanec argues that this knowledge precludes summary judgment.

¶ 10 Schovanec states that the Archdiocese, by way of its priests and employees, knew that Imming routinely skinny-dipped with unrelated minors, and did so on some occasions without the presence of any other adult. He cited to material from four depositions to show that the Archdiocese knew or should have known of the skinny-dipping. They include (1) a deposition of an adult, C.S., who was raised by Father Imming, (2) a deposition of a priest, Father Bird, (3) a deposition of another priest, Father Ross,

and (4) the deposition of Carole Goodwin, a former employee at St. Gregory's in Enid, Oklahoma.[2] He also referenced material in other depositions.

¶ 11 When asked if priests in the Archdiocese knew of any skinny-dipping incident involving Father Imming, C.S. responded with "I'm not for sure." O.R. Vol. I, Tab 6, Exhibit 4 at 320–321. He later stated that he was not aware of any conversations about skinny-dipping between Father Imming and Archbishop Beltran. *Id.* at 322. He also testified that the skinny-dipping occurred on fishing trips where several people attended, these trips often included grown men, and it was not a secret that skinny-dipping occurred on some of the trips. *Id.* at 324–325. Father Ross stated that he had heard a rumor of Father Imming taking minor boys skinny-dipping, but did not know when he had heard the rumor. O.R. Vol. III, Tab 12, Exhibit 8 at 24.

¶ 12 Father Bird testified that sometime between 1981 to 1983 he heard that Father Imming went skinny-dipping with members of Father Imming's youth group. O.R. Vol. III, Tab 12, Exhibit 9 at 19–20. Carole Goodwin, who was employed at St Gregory's during the time Father Imming was at St. Gregory's, heard in casual conversations that families, the youth group, and some adults from Vance Air Force Base went fishing together, and she heard on more than one occasion that the males, including the youth, went skinny-dipping. *Id.* at Tab 12, Exhibit 18 at 25–28, 69, 72–75.

¶ 13 Archbishop Beltran testified that in the 1980s it would have been improper for a priest to take minors skinny-dipping without another adult present. O.R. Vol. II, Tab 11, unnumbered exhibit at 76. There was no indication in the depositions of Goodwin or Father Ross that the skinny-dipping occurred with Father Imming as the only adult present. Father Imming's deposition states that he did not remember any time that he was the sole adult present when skinny-dipping occurred. O.R. Vol. III, Tab 12, Exhibit 3 at 142. Father Mickus testified that a

2. (1) O.R. Vol. I, Tab 6, no page cited; (2) O.R. Vol. III, Tab 12, Exhibit 9, 19–20; (3) O.R. Vol. III, Tab 12, Exhibit 8, 23–24; and (4) O.R. Vol. III, Tab 12, Exhibit 18, at 25–28.

priest should report to the Archbishop or Archdiocese any incident of a priest skinny-dipping with minors. *Id.* at Tab 12, Exhibit 6 at 33–34. Father Mason also testified that a priest should report to the Archdiocese or Archbishop any incident of a priest skinny-dipping with minors. O.R. Vol. III, Tab 12, Exhibit 26 at 20. Schovanec testified that he and Father Imming went skinny-dipping when no one else was present. O.R. Vol. II, Tab 10, Exhibit 1 at 22.

¶ 14 Schovanec argues that Father Imming had minors spend the night with him and took minors on trips, and that this qualifies as a form of sexual abuse as recognized in the church. Father Bird visited Father Imming and knew that C.S. was sleeping at the rectory. O.R. Vol. III, Tab 12, Exhibit 9 at 30. One adult male, Ke. C., testified that when he was younger he went on fishing trips with Father Imming and everyone on the trip went skinny-dipping, and that Father Imming took him on trips from Enid to Duncan. *Id.* at Tab 12, Exhibit 10 at 21–22. He testified that he saw Father Imming give another youth, D. I., a back rub at Father Imming's house in Enid while they were watching television. *Id.* at Tab 12, Exhibit 10 at 36. Archbishop Beltran testified "Yes" when he was asked "was the Archdiocese of Oklahoma City ever aware of Father Imming having boys on a routine, regular basis spend the night in the rectory at St. Gregory's?" *Id.* at Tab 12, Exhibit 30 at 70. He testified that he was made aware of this fact prior to the litigation, but he could not state the approximate time that he first knew this fact. *Id.*

¶ 15 D.C. testified that her son Ky., traveled to Duncan with Father Imming. A male adult, S.M., testified that in 1985, when he was fifteen years old he accompanied Father Imming on a trip to Duncan to the home of Father Imming's parents, where Father Imming allegedly rubbed S.M.'s back and grabbed his genitals while sleeping in the same bed. S.M. explained that the guest room had one "pull-out couch" where Father Imming and he slept together. The adult male raised by Father Imming, C.S., testified that "a lot of kids" made a trip with Father Imming to Duncan, and that when visiting in Duncan the guests slept in the same room, including Father Imming.

¶ 16 Father Imming testified that while serving in Enid he took a minor, D.I., on a trip with him to Canada, and that there was never a time that he took two or more boys with him on a trip. *Id.* at Tab 12, Exhibit 3 at 94–95. He also testified that C.S., the boy he raised, was always present when young boys stayed overnight at his house in Enid. One person, M.I., testified that he stayed one night at Father Imming's house when "going over some stuff for confirmation," O.R. Vol. III, Tab 12, Exhibit 12 at 16, but the deposition material does not show the age of M.I. at that time or when the event occurred. He testified that no other priest, parish employee, or other adult lived with Father Imming when he resided at the rectory owned by the Archdiocese in Enid. Father Bird testified that on one visit to Father Imming he became aware that Father Imming "was allowing boys other than C.S. to reside with him." O.R. Vol. III, Tab 12, Exhibit 9 at 27.

¶ 17 Schovanec testified that during 1981 to 1986 "Father Imming told me and others that the archdiocese was on his back about C ... S ... living there [with Father Imming] about him having the boys over there all the time and hanging out with boys, the guys over there, and hanging out at the lake house and stuff with them...." O.R. Vol. III, Tab 12, Exhibit 1 at 25 (explanatory phrase added and name of C.S. redacted). He testified that Father Imming told him "don't tell the archdiocese about this [trip to Duncan] or they won't let you come down here [to Duncan] anymore, because they're already giving me a hard time about hanging out with the guys already." *Id.* at 27 (explanatory phrases added). He explained that "hanging out with the guys" meant "[h]aving the guys hang out over at his house." *Id.* Schovanec explained that Father Imming related that "he had his own way of doing things and that was the way he connected and counselled [sic] boys [and] ... they [the Archdiocese] don't complain about the—him filling up the church ... [so] why should they complain about the way he spends time with the kids, I mean, the guys, you know, he always said the guys." *Id.* at 27 (explanatory phrases added

and material omitted). The exact complaint that the Archdiocese had with the way Father Imming counseled boys or "hung out with the guys" was not testified to by Schovanec, except that Father Imming explained that "He just said he had his own way of doing things and that was the way he connected and counselled [sic] boys." *Id.* at 28. Archbishop Quinn, a former Archbishop in Oklahoma, testified that during a meeting with then Archbishop Salataka the latter discussed his conflict with Father Imming concerning Imming's "conformity to the polices of the Archdiocese...." O.R. Vol. III, Tab 12, Exhibit 31 at 33. Schovanec testified that Father Imming told him that the Archdiocese wanted Imming to remove C.S. from residing at the rectory. O.R. Vol. III, Tab 12, Exhibit 1 at 25–27.

¶ 18 Schovanec testified that "He [Father Imming] always had Bud [beer] in his fridge for everybody." O.R. Vol. II, Tab 10, Exhibit 1 at 148 (explanatory phrase added). Schovanec testified that Father Imming "drank Budweiser in a can a lot. And that's what he usually gave out at fishing and stuff like that." O.R. Vol. III, Tab 12, Exhibit 1 at 108. C.S. testified that several boys and young men "would come and hang out" at the rectory (Father Imming's residence), "[j]ust a lot of these—a lot of schoolkids, like I said, that weren't necessarily involved with the church." O.R. Vol. I, Tab 6, Exhibit 4 at 68. Schovanec testified of that he gave Father Imming a back rub on his shoulders once at the rectory when "There were a bunch of guys over, hanging out, drinking beer, watching TV." O.R. Vol. II, Tab 10, Exhibit 1 at 163. Schovanec testified that Father Imming gave and received back rubs with minors; for example, he testified of one occasion when "There was [sic] some guys over and he [Father Imming] was giving back rubs...." O.R. Vol. II, Tab 10, Exhibit 1 at 162. C.S. testified that the back rubs were not secret, but he did not know any priest that had actual knowledge of Father Imming exchanging back rubs with minors. O.R. Vol. I, Tab 6, Exhibit 4 at 320–321.

¶ 19 Father Mickus testified that alcohol consumption by a priest with members of his youth group is inappropriate conduct. O.R. Vol. III, Tab 12, Exhibit 6 at 36. Father Gatlin testified that he "heard the rumors of parties at the rectory" but he did not know what activities took place at the parties, O.R. Vol. III, Tab 12, Exhibit 7 at 17; he stated that he heard the rumors "20 years ago" "back when he [Father Imming] was there [in Enid];" he also testified that even if he had known of alcohol consumption at the parties he would not "have felt an obligation to report that to somebody within the archdiocese ... [because he] wouldn't have wanted to get him into trouble." O.R. Vol. III, Tab 12, Exhibit 7 at 33 (material omitted and explanatory material added).

¶ 20 Father Levin testified that there is no written rule requiring a report to the Archdiocese when a priest supplies a minor with non-sacramental alcohol, but as a matter "of conscience," that is, "knowing what's right and wrong," the incident should be reported. O.R. Vol. III, Tab 12, Exhibit 25 at 31–32. Similarly, Father Levin testified that a priest and minor giving and receiving back rubs is inappropriate conduct that should be reported to the Archbishop or the vicar general (an administrative official) of the Archdiocese. *Id.* at 1, 18, 36. He also testified that if a priest knows of another priest skinny-dipping with minors, the conduct should be reported to the Archbishop or a vicar general. *Id.* at 37. Father Kayler testified that if one priest knows that another priest engages in skinny-dipping with young boys, or mutual back rubs with minors, or provides minors with non-sacramental alcohol, then the conduct should be reported to the Archbishop. *Id.* at Exhibit 32 at 24–25. Father Dowdell testified that a priest's conduct involving boys sleeping overnight on a regular basis in the rectory would have been reported to a member of the "health panel" for the Archdiocese, a group of priests and lay people that assist priests with the priest's perceived emotional problems that are investigated. *Id.* at Exhibit 29 at 23 –24. Father Dowdell also testified that supplying alcohol to minors would "raise a red flag" and was unacceptable conduct. *Id.* at Exhibit 29 at 24–25. Father Mason testified that he knew of Father Imming, but did not know of his personal practices because Father Imming "began to isolate himself from other priests ... and

the diocese." O.R. Vol. III Tab 12, Exhibit 26 at 8. He also stated that had he known of Father Imming skinny-dipping with youth, providing alcohol to youth, and allowing boys to sleep at the rectory overnight, he would have reported that conduct to the Archbishop. *Id.* at 20–21.

¶ 21 J.G., a former youth of the parish, testified that Father Imming "was always offering alcohol, whether it be beer or scotch, something along those lines." O.R. Vol. III, Tab 12, Exhibit 39 at 41. C.M. testified that he went with Father Imming and another youth, J., to a lake where Father Imming and J. drank scotch and he drank beer from the cooler of beer that Father Imming brought for the trip. O.R. Vol. III, Tab 12, Exhibit 36 at 14, 18. One adult, Ke. C. testified that the youth on fishing trips knew that Father Imming "had a pretty strict rule" about drinking alcohol, and they did not let Father Imming catch them drinking beer. O.R. Vol. II, Tab 10, Exhibit 10 at 19. Carole Goodwin, a former employee at St. Gregory's, testified that the policy of Father Imming and St. Gregory's was that when a youth was "caught with alcohol" during church functions or trips, the parents were called and the youth sent home, if possible. O.R. Vol. II, Tab 10, Goodwin deposition at 29–30. Father Imming stated that he never gave alcohol to any minor other than C.S., the boy who lived with him. He stated that he did not recall seeing any of the youth consume alcohol on the fishing trips. O.R. Vol. III, Tab 12, Exhibit 3 at 145.

¶ 22 Schovanec testified that Father Imming "acted like I was his best buddy. He would say you're my best buddy and take me places. And he had taken me under his wing after my father died." O.R. at Vol. II, Tab 10, Exhibit 1 at 96. He testified that he drank beer and skinny-dipped with Father Imming before the first alleged event of abuse. He testified of two alleged abuse events that occurred in Duncan and two events of abuse at the rectory. *Id.* at 8, 93, 150–153. He testified that Father Imming "asked me to come over.... And we got pretty intoxicated. And, I mean, we drank a lot that night ..." and then he testified of an

alleged abuse incident. *Id.* at 146. He testified that the youth living with Father Imming, C.S., was not present at the rectory on the occasions that Schovanec and Father Imming drank beer and the alleged abuse occurred, and that C.S. was "either at his Mom's or staying with somebody else." *Id.* at 150.

¶ 23 An adult male, J.G., testified that a parish family allowed Father Imming the use of their cabin at a lake and that Father Imming took him, when a youth, and another youth to the cabin. He stated that Father Imming told him that

> ... he had taken young men out there on several occasions skinny-dipping, and he invited C ... M ... and I out to spend the night at the cabin, and I told him that was not something I was comfortable with—it was a very shaming thing to be naked with other people ... Father Dave [Imming] had invited me over to have dinner and spend the night, and I had confided in Father Dave that that was not something that I was comfortable with. He was a priest. I thought he might have some insight, and he suggested that we sit around his house naked, and I thought it was a safe environment, so I agreed. As we sat there—and being very uptight and tense—he suggest that he rub my back, and I was uncomfortable with that, but he talked me into it.

O.R. at Vol. III, Tab 12, Exhibit 39 at 40–41 (explanatory word added and identity deleted in part).

He continued with testimony describing how Father Imming touched him inappropriately and invited him to sleep with him. *Id.* at 41. He also testified that Father Imming tried to do the same thing to him when he was older. *Id.*

¶ 24 Archbishop Beltran testified that within the "first couple years" after his arrival in Oklahoma City, he noticed the problem of Father Imming not attending meetings for priests. O.R. Vol. III, Tab 12, Exhibit 30 at 18. He expressed his concern to Archbishop Salatka,[3] who stated that he previously had the same problem with Father Imming and

---

**3.** Charles Salatka was Archbishop of the Archdiocese from 1977 to 1993.

made an additional observation that Father Imming had not followed the teachings of the church sufficiently in matters relating to "liturgical aberrations" involving, for example, "proper vestments," "proper elements of the proper bread," and "instructing people improperly regarding posture during the Eucharist." *Id.* at 20, 25, 27. Archbishop Beltran testified that the sole reason he asked Father Imming to retire was his concerns relating to Father Imming's absence at meetings for priests and Father Imming's liturgical aberrations. *Id.* at 56, 88.

¶ 25 Schovanec uses three related methods for the purpose of showing that the Archdiocese knew of the alleged abuse by Father Imming. First, Schovanec uses the alleged facts of Imming skinny-dipping with youth, Imming providing alcohol to minors, his trips with minors, minors spending nights with Imming, a minor living with Imming, parties with young boys at the rectory, and the Archdiocese wanting Father Imming to find another home for the minor living with him as facts which a reasonable person would use to infer the fact that Father Imming engaged in sexual abuse with minors.

¶ 26 Schovanec bolsters his argument with the added concept that the reasonableness of moving from the alleged known conduct to an inference of sexual abuse is shown by (1) the alleged fact that Canon Law prohibits a minor residing with a priest without the permission of the priest's bishop or archbishop, and (2) Father Imming's skinny-dipping with minors, providing alcohol to minors, making trips with minors, minors spending nights with him, parties in the rectory with youth, and a minor living with him are all facts that reasonably may be construed collectively as a "grooming process" used by a sexual predator,[4] justifying an inference of sexual abuse. In sum, he argues that the Archdiocese had a *"reason to know"* of the alleged sexual abuse from other facts and he argues that the Archdiocese's failure to correct such conduct is a failure to supervise.

¶ 27 Secondly, Schovanec uses a priest's status as an employee subject to the directions of an Archbishop and the Archbishop's role in supervising the moral conduct of priests to show that the Archdiocese should have investigated Father Imming and therefore should have uncovered and known of the alleged sexual abuse. Schovanec argues that an employer generally, and more specifically an Archdiocese employer, has a duty to know what its employees are doing that reflects on their moral fitness. Schovanec is essentially arguing that the concept of employer supervision includes a *duty to ascertain and know certain facts,* (or a duty to investigate), and that the Archdiocese's failure to investigate its employee shows a breach of that duty.

¶ 28 Schovanec also uses a combination of the *"reason to know"* and *"should know"* concepts. He argues that when an Archdiocese has reason to know that a priest is skinny-dipping with minors, providing alcohol to minors, making trips with minors, minors spending nights with the priest, parties with youth in the rectory, and a minor living with a priest, then such knowledge should create a duty on the part of an Archdiocese, as the employer of the priest, to investigate and determine whether sexual abuse is occurring. That is, the reason to know certain facts creates a duty for the Archdiocese to investigate whether abuse is occurring. For Schovanec, this failure to investigate is a failure to supervise an employee.[5]

¶ 29 The Archdiocese and Archbishop Beltran state that the Archdiocese knew that Father Imming had a minor child, C.S., living with him, and the Archdiocese approved of this living arrangement because the mother of C.S. approved of the relationship and C.S. was a "troubled youth" who needed a "foster parent/foster son" relationship. O.R. Vol. I, Tab 5, Exhibit 5, Defendants' responses to requests for admissions. In reply to Schovanec's evidentiary materials, the Archdiocese and Archbishop Beltran argue that

---

4. Schovanec argued that the Archdiocese fails to recognize a common practice used by sexual predators of minors, "grooming," which includes providing the minors with gifts, money, vehicles, overnight travel, etc. O.R. Vol. I, Tab 6, Sept. 13, 2004, response on summary judgment, 8.

5. Schovanec also relies upon materials purportedly describing the conduct of former Archbishop Charles A. Salatka, but we need not detail and address those allegations to resolve the appeal.

no showing has been made that a supervisory duty has been breached until someone actually makes a complaint about a priest to the Archdiocese, the complaint must expressly and specifically allege a form of sexual abuse by the priest, and the Archdiocese fails to act in response to that complaint.[6]

¶ 30 The Archdiocese and Archbishop Beltran rely on *N.H. v. Presbyterian Church (U.S.A.), supra*, where we stated that "The critical element for recovery is the employer's prior knowledge of the servant's propensities to create the specific danger resulting in damage." *N.H. v. Presbyterian Church (U.S.A.)*, 1999 OK 88, ¶ 21, 998 P.2d at 600. In support of this statement we cited *Dayton Hudson Corp. v. American Mutual Liability Ins. Co.*, 1980 OK 193, 621 P.2d 1155, 16 A.L.R.4th 1.[7] We stated the following in *Dayton.*

> When recovery against the employer for an act of his servant is rested on prior knowledge of the servant's propensity to commit the very harm for which damages are sought, the basis of liability invoked is not respondeat superior but rather the employer's own negligence in not discharging the unfit servant.... Cases in which the master may have had reason to foresee the servant's injurious conduct from past events doubtless fall into a wide range of variety.

*Dayton Hudson Corp. v. American Mutual Liability Ins. Co.*, 1980 OK 193, ¶ 17, 621 P.2d at 1161 (material omitted)

They rely on this authority for the concept that the employer (or master) does not have a reason to foresee a specific type of conduct unless the employer is actually aware of that specific conduct by that employee (servant) on a previous occasion. This argument is composed of two issues: the notice to the employer must be "actual," and there must be an exact identity between the harm-producing conduct alleged and the conduct of which the employer had previous notice.

¶ 31 The Archdiocese's argument that the knowledge of the employer must be a form of actual notice fails to recognize our explanations that a principal (employer) may receive notice of an event by notice of it to the employer's employee. In *State ex rel. Oklahoma Bar Association v. Scroggs*, 2003 OK 21, 70 P.3d 821, we stated the following.

> Dr. Merrill has stated that "It is a commonly employed phrase that a principal is bound by notice to or the knowledge of his agent in respect to the matters within the agent's authority." 3 *Merrill on Notice*, § 1203A (1952). Further, that knowledge of an agent is a source of notice to the agent's principal if the matter is "in the scope of the agency," and "connected with it," and "falls within the category of facts which the agent owes a duty to communicate." *Id.* at § 1223.

*Scroggs, 2003 OK 21* at ¶ 23, 70 P.3d at 828.

*Scroggs* is consistent with our language in *Oklahoma Alcoholic Beverage Control Bd. v. Parkhill, Restaurants, Inc.*, 1983 OK 77, 669 P.2d 265, where we stated that "we note the established rule that notice to the agent constitutes notice to the principal unless circumstances are such as to raise a clear presumption that he will not communicate the knowledge to his principal." *Id.* at n. 25, 669 P.2d at 273, citing, *A.A. Murphy, Inc. v. Banfield*, 1961 OK 197, 363 P.2d 942.

---

**6.** The Archdiocese and Archbishop Beltran state that they had no knowledge of any allegation of sexual impropriety by Father Imming until the Spring of 2002 when they heard that a family, unrelated to Schovanec, had declined to be included in a retirement celebration for Father Imming, and upon a priest's questioning a member of the family about their planned absence, an allegation was made that Father Imming had made a sexual advance to a minor male of the family several years previously. O.R. at Vol. I, Tab 5, Exhibit 5, Defendants' response to requests for admissions; O.R. Vol. II, Tab 10, Exhibit 2, Deposition of B.M.; O.R. Vol. II, Tab 4, Deposition of Father Kowalski.

**7.** We also cited *Isely v. Capuchin Province*, 880 F.Supp. 1138, 1151 (E.D.Mich.1995), for the proposition that without evidence that abuse was reported to a church defendant no liability would be imposed, and *Roman Catholic Bishop of San Diego v. Superior Court*, 42 Cal.App.4th 1556, 50 Cal.Rptr.2d 399 (1996), for the proposition that a lack of criminal conviction or actual knowledge prevented imposition of liability. *N.H. v. Presbyterian Church (U.S.A.)*, 1999 OK 88, n. 38, 998 P.2d at 600.

¶ 32 Several deposition materials show that some priests were of the opinion that they had a duty, in conscience as priests, to report a priest's conduct of skinny-dipping with minors, alcohol distribution to minors, and mutual back rubs with minors to the Archbishop or proper archdiocese authority such as the vicar general or health panel. The Archdiocese's reply on summary judgment takes issue with Schovanec's "attempts to place notice on the Church" through the knowledge that certain priests had of Father's Imming's conduct.[8] We need not assess the degree to which the evidentiary materials of the Archdiocese conflict with those of Schovanec on this point. Conflicting evidence on the scope of agency requires that issue to be determined by a trier of fact. *Bullard v. Caulk,* 1951 OK 257, 243 P.2d 691, 695; *Dunlap v. Shuler,* 1943 OK 291, 141 P.2d 585, 586. Thus, the issue is not proper for a summary judgment.[9]

■ ¶ 33 The Archdiocese's argument on the identity-of-conduct issue is similar to that made by defendants in dog-bite cases where they argue that a dog's first bite is liability-free as it constitutes the notice to the owner of the dog's biting propensity. In the case before us today, the Archdiocese essentially argues that the first instance of sexual abuse is liability-free because it constitutes notice to the employer of the priest's propensity that is required before liability is created for the Archdiocese as an employer. There is no common-law liability-free dog-bite in Oklahoma based upon a lack of a dog owner's notice of an actual bite,[10] and there is also no "one liability-free sexual abuse act" for employers supervising employees in Oklahoma when liability is denied because the notice-producing act of the employee is not exactly identical to the harm-producing act of the employee. This conclusion is shown by our opinion in *Mistletoe Express Service, Inc. v. Culp,* 1959 OK 250, 353 P.2d 9.

¶ 34 In *Mistletoe* we discussed whether an instruction was properly submitted to a jury based upon allegations of employer negligence in hiring and retaining an employee because the employer either knew *"or by the exercise of ordinary care could have known"* of the employee's nature as a quarrelsome, hot-tempered and antagonistic person. *Id.* 353 P.2d at 13. In *Mistletoe* an employee used his fist to strike a customer in the face "without warning" after they argued. *Id.* 353 P.2d at 11. We focused on whether there was evidence of the employee's quarrelsome and hot-tempered nature, and evidence of this nature included the employee's history of fighting.

> There was evidence that Wolfe was a quarrelsome, hot-tempered, antagonistic person, which was known to Mistletoe *or which, by the exercise of ordinary care, could have been known by it at the time of and during his employment.* Mistletoe could not close its eyes to the fact that Wolfe had before and during his employment "lots of fights," and earned the nickname of "slugger." It could not discharge its duty to the public with whom Wolfe necessarily dealt by admonishing him after one fight to "watch his temper," and later he "was going to have to stop that stuff."

*Mistletoe Express Service, Inc.,* 353 P.2d at 13 –14, emphasis added.

The propriety of the jury instruction did not hinge on the plaintiff producing evidence that the employee had previously struck another customer in the face during an argument and the employer had actual notice of such conduct. The issue was whether there was evidence showing that the employer either knew, or reasonably could have known, that the employee's nature was such to create a specific risk to the employer's customers and

---

8. O.R. Vol. IV, Tab 13, Defendants' Reply, 3 (objecting to notice of skinny-dipping to Archdiocese by knowledge of Father Bird).

9. The moving party has the burden to show there is no substantial controversy as to any material fact. *Evers v. FSF Overlake Associates,* 2003 OK 53, ¶ 9, 77 P.3d 581, 585 citing *Bowers v. Wimberly,* 1997 OK 24, 933 P.2d 312, 315.

10. *See, e.g., Harris v. Williams,* 1932 OK 646, 15 P.2d 580, 581 ("... there need be no notice of injury actually committed, and it is, therefore, unnecessary to prove that a dog had ever bitten any person, if the owner had seen or heard enough to convince a man of ordinary prudence of the animal's inclination to commit injuries of the class complained of.")

whether the customer's injury was a result of that risk.

¶ 35 In *Mistletoe* we noted *Restatement (First) of Agency* § 213 (1933).[11] *Mistletoe,* 353 P.2d at 16. The Restatement (Second) of Agency § 213 (1957) (Principal Negligent or Reckless), that was current when the acts occurred complained of by Schovanec, states the following.

A person conducting an activity through servants or other agents is subject to liability for harm resulting from his conduct if he is negligent or reckless:

(a) in giving improper or ambiguous orders of in failing to make proper regulations; or

(b) in the employment of improper persons or instrumentalities in work involving risk of harm to others:

(c) in the supervision of the activity; or

(d) in permitting, or failing to prevent, negligent or other tortious conduct by persons, whether or not his servants or agents, upon premises or with instrumentalities under his control.

Section 213 is an application from the Restatement (Second) of Torts.[12] Comment "d" to § 213, the same Comment we quoted from in *Mistletoe,*[13] states in part.

d. *Agent dangerous.* The principal may be negligent because *he has reason to know that the servant or other agent, because of his qualities, is likely to harm others in view of the work or instrumentalities entrusted to him.* If the dangerous quality of the agent causes harm, the principal may be liable under the rule that one initiating conduct having an undue tendency to cause harm is liable therefor. See the Restatement of Torts, § 308.

The dangerous quality in the agent may consist of his incompetence or unskillfulness due to his youth or his lack of experience considered with reference to the act to be performed. An agent, although otherwise competent, may be incompetent because of his reckless or vicious disposition, and if a principal, without exercising due care in selection, employs a vicious person to do an act which necessarily brings him in contact with others while in the performance of a duty, he is subject to liability for harm caused by the vicious propensity. The negligence may be in entrusting an agent with instrumentalities which, in connection with his known propensities and the qualities of the instrumentalities, constitute an undue risk to third persons. These propensities may be either viciousness, thoughtlessness, or playfulness.

One who employs another to act for him is not liable under the rule stated in this Section merely because the one employed is incompetent, vicious, or careless. *If liability results it is because, under the circumstances, the employer has not taken the care which a prudent man would take in selecting the person for the business in hand. What precautions must be taken depend upon the situation.* One can normally assume that another who offers to perform simple work is competent. If, however, the work is likely to subject third persons to serious risk of great harm, there is a special duty of investigation. Liability results under the rule stated in this Section, not because of the relation of the parties, but because the employer antecedently had reason to believe that an

---

**11.** § 213 Principal Does Not Intend Conduct Or Consequences

A person conducting an activity through servants or other agents is subject to liability:
(a) if he is negligent in the conduct of such activity; or
(b) if he permits his servants or other agents to act negligently upon his premises or with his instrumentalities.

**12.** Comment "a" to § 213 states in part: "*a.* The rule stated in this Section is not based upon any rule of the law of principal and agent or of master and servant. It is a special application of the general rules stated in the Restatement of Torts and is not intended to exhaust the ways in which a master or other principal may be negligent in the conduct of his business. The fact that the conduct is subject to a person's directions and is upon his account is considered in determining the precautions which such person is required to take to prevent his conduct from being negligent. Liability exists only if all the requirements of an action of tort for negligence exist...." Restatement (Second) of Agency § 213 cmt. a (1957).

**13.** *Mistletoe Express Service, Inc.,* 353 P.2d at 16.

undue risk of harm would exist because of the employment. The employer is subject to liability only for such harm as is within the risk. If, therefore, the risk exists because of the quality of the employee, there is liability only to the extent that the harm is caused by the quality of the employee which the employer had reason to suppose would be likely to cause harm.

Restatement (Second) of Agency § 213 cmt. d (1957), emphasis added.

This language points out that liability is based upon whether the employer "has reason to know that the servant or other agent, because of his qualities, is likely to harm others in view of the work … entrusted to him." This reason to know is based upon what a reasonably prudent person would believe concerning the employee's conduct in the particular situation.[14] Our language in *N.H. v. Presbyterian Church (U.S.A.), supra,* is consistent with the Restatement and with *Mistletoe* where we indicated that the focus of the inquiry is whether the employer had reason to believe that the employee would create an undue risk of harm to others and the employer is held liable for this knowledge and failing to act upon it. *N.H. v. Presbyterian Church (U.S.A.),* 1999 OK 88, ¶ 20, 998 P.2d at 600.

¶ 36 Schovanec relies upon *Moran v. City of Del City,* 2003 OK 57, 77 P.3d 588, for the proposition that the Archbishop, as a supervisor, *should know* what his priests are doing as part of their daily routine to prevent and guard against sexual abuse. In *Moran* we explained that the concept of a person's duty to discover facts, and to anticipate what might occur under the circumstances, is involved, at some point, in all negligence cases. *Id.* at ¶ 11, 77 P.3d at 592. A person's knowl-edge of a fact may arise by two related but distinct methods. A reasonable person may infer that a fact exists from a fact that person already knows. A duty may require a reasonable person to ascertain whether a fact exists because of the performance of that duty. The Restatement (Second) of Torts § 12 (1977),[15] refers to the first method as describing a person's *"reason to know"* and the second as when a person *"should know"* a fact. The Restatement indicates that the phrase "reason to know" refers to knowledge of a fact from knowledge of other facts, while "should know" refers to a person's duty to know a fact.

¶ 37 Schovanec argues that an ecclesiastical supervisor, as an employer, *should know* whether the clergy he or she supervises is abusing minors placed in the ecclesiastical charge of the clergy. Schovanec here uses the phrase "should know" as a continuing duty of the supervisor to investigate the fitness of an employee to supervise minors. The *Restatement (Second) of Torts,* § 317 cmt. b (1977)(material omitted and emphasis added) states as follows.

§ 317. Duty Of Master To Control Conduct Of Servant

A master is under a duty to exercise reasonable care so to control his servant while acting outside the scope of his employment as to prevent him from intentionally harming others or from so conducting himself as to create an unreasonable risk of bodily harm to them, if

(a) the servant

(i) is upon the premises in possession of the master or upon which the servant is privileged to enter only as his servant, or

---

**14.** For example, the second illustration for Comment d in § 213 states that "2. P employs A to dispossess T from P's premises. From facts known to P, a reasonably prudent person would believe that A would use excessive force in the dispossession. A uses such force. P is subject to liability to T." Restatement (Second) of Agency § 213 cmt. d, illus. 2 (1957).

**15.** *Restatement (Second) of Torts,* § 12 (1977).
 "(1) The words 'reason to know' are used throughout the Restatement of this Subject to denote the fact that the actor has information from which a person of reasonable intelligence or of the superior intelligence of the actor would infer that the fact in question exists, or that such person would govern his conduct upon the assumption that such fact exists.
 (2) The words 'should know' are used throughout the Restatement of this Subject to denote the fact that a person of reasonable prudence and intelligence or of the superior intelligence of the actor would ascertain the fact in question in the performance of his duty to another, or would govern his conduct upon the assumption that such fact exists."

(ii) is using a chattel of the master, and

(b) the master

(i) knows or has reason to know that he has the ability to control his servant, and

(ii) knows or should know of the necessity and opportunity for exercising such control.

Comment b to this section states in part the following.

b. *Master's duty to police his premises and use made of his chattels.* *A master is required to police his own premises,* and those upon which, though in the possession of another, he has a privilege of entry for himself and his servants, to the extent of using reasonable care to exercise his authority as a master in order to prevent his servant from doing harm to others. *So too, he is required to exercise his authority as master to prevent them from misusing chattels which he entrusts to them for use as his servants. This is true although the acts of the servant while upon the premises or in the use of the master's chattels are done wholly for the servant's own purposes and are, therefore, outside the course of the servant's employment and thus do not subject the master to liability under the rules of the law of Agency.* . . . Thus, a factory owner is required to exercise his authority as master to prevent his servants, while in the factory yard during the lunch hour, from indulging in games involving an unreasonable risk of harm to persons outside the factory premises.

Restatement (Second) of Torts § 317 cmt. b (1977) (material omitted and emphasis added).

On the issue of the knowledge of the master (or employer), the Reporter's Notes state in part the following.

The mere fact that the servants are using the master's chattels dangerously or mis-

conducting themselves upon the master's premises is not enough to make the master liable. *It is necessary to show that the master knew of the practices,* and that he did not take the appropriate steps to stop them; *or at least that he reasonably should have discovered them.*

Restatement (Second) of Torts § 317 Reporter's Notes (1977), (emphasis added).

We agree with the Archdiocese that it is not an insurer for every act by one of its priests at a rectory.[16] One of the opinions cited in the Reporter's Notes, *De Ryss v. New York Cent. R. Co.,* 275 N.Y. 85, 9 N.E.2d 788, 790 (1937), indicates that acts occurring within the knowledge of an employee may show notice of those acts to the employer.[17] Schovanec makes a similar argument that the numerous types of improper acts by Father Imming known by priests or employees of the Archdiocese show that the Archdiocese had notice of those acts.

■ ¶ 38 When adjudicating a motion for summary judgment, all facts and inferences must be viewed in the light most favorable to the non-movant. *Manley v. Brown,* 1999 OK 79, ¶ 22, 989 P.2d 448, 455; *Phelps v. Hotel Management, Inc.,* 1996 OK 114, 925 P.2d 891, 893–894. The evidentiary materials may be summarized as follows. A priest testified of hearing rumors of parties at the rectory. Schovanec does not point to a priest having actual knowledge of Father Imming providing alcohol to minors, but he does supply evidentiary materials supporting the inference that it was common knowledge among young men hanging-out at the rectory that alcohol was available from Father Imming. The Archdiocese was concerned about Father Imming's practice having boys hanging-out at the rectory and his method of counseling them. A priest testified that he knew that Father Imming was allowing boys to spend nights at the rectory. Both an em-

---

16. *Accord, Taylor v. Hynson,* 1993 OK 93, 856 P.2d 278, 281 ("An invitor is not an insurer of the safety of others and is not required to prevent all injury occurring on the property . . . An invitor does not have a duty to protect invitees from criminal assaults by third persons, . . . unless the invitor knows or has reason to know that the acts of the third person are occurring, or are about to occur."), (material and citations omitted).

17. *De Ryss,* 9 N.E.2d at 790 (a "single act" prohibited by an employer, but allowed by an employee, may not be sufficient by itself show notice of the act to the employer, but an implied knowledge of the employer may be shown by "continued acts" prohibited by the employer occurring on the employer's property and known by an employee).

ployee of the parish and a priest knew that Father Imming skinny-dipped with youth. Schovanec does not point to an employee of the diocese knowing that Father Imming gave and received back rubs with minors. But C.S. testified that while residing at the rectory Father Imming's practice of back rubs was not done secretly but was observable to those at the rectory. The Archdiocese wanted Father Imming to end the live-in relationship with a boy living at the rectory. Archbishop Salatka was concerned that Father Imming did not attend meetings for priests. A priest testified that it was common knowledge among priests that Father Imming was isolating himself from other priests and the Archdiocese. Schovanec also submitted material relating to clergy abuse of minors within the Roman Catholic Church and argued that the facts should be viewed as showing, or at least providing an inference of, a pattern consistent with a priest committing sexual abuse of minors.

¶ 39 The Archdiocese argues that the evidence, as summarized above, and the inferences are insufficient to show notice to the Archdiocese of Father Imming's alleged sexual abuse of a minor. A trial court determination that no fact exists of record to support the issue of fact submitted for resolution is a determination of an issue of law and requires a *de novo* review. *Christian v. Gray*, 2003 OK 10, ¶ 44 & n. 21, 65 P.3d 591, 609. The Archdiocese must show, in support of its quest for summary judgment, that no

reasonably prudent person, in the circumstances of the Archdiocese, as employer, would believe that the above-summarized facts create an inference of abuse. Restatement (Second) of Agency § 213, *supra.* In other words, the Archdiocese maintains that the above summarized facts, as a matter of law, are incapable of creating an inference that the Archdiocese had reason to know that Father Imming was abusing minors. We disagree with the Archdiocese's conclusion, in part, because of evidence of minors spending nights with Father Imming at the rectory, the property of the Archdiocese, when there is no evidence that those living arrangements were part of a specialized youth program involving the presence of other adults. When minds differ on what a reasonably prudent person would do in the circumstance of the defendant, the issue is not fit for summary judgment and should be decided by the trier of fact.[18]

¶ 40 In *Dayton Hudson Corp. v. American Mutual Liability Ins. Co., supra,* we observed that "Cases in which the master may have had *reason to foresee* the servant's injurious conduct from past events doubtless fall into a wide range of variety." 1980 OK 193, ¶ 17, 621 P.2d at 1161, (emphasis added). In *Dayton* we did not use the term "foresee" in the sense of determining whether employers, as a class, possess a duty to recognize or appreciate harm-producing conduct of employees,[19] and we need not determine wheth-

18. *See, e.g., Dayton Hudson Corp. v. American Mutual Liability Ins. Co.,* 1980 OK 193, 621 P.2d 1155 (a trier of fact must determine whether an employer was guilty of "reckless disregard of the safety of others," and whether employer knew that an employee was "vicious" versus merely "unfit" or "erratic".); *Cities Service Oil Co. v. Kindt,* 1947 OK 219, 190 P.2d 1007, 1011 (what the reasonably prudent person would do was a question for the jury).

19. *See, e.g., Lowery v. Echostar Satellite Corp.,* 2007 OK 38, ¶ 14, 160 P.3d 959, 964 ("The most important consideration in determining the existence of a duty of care is foreseeability of harm to the plaintiff"); *Moran v. City of Del City,* 2003 OK 57, n. 4, 77 P.3d 588, 592 (foreseeability is a term used in both defining a duty and as an element of proximate cause); *Strubhart v. Perry Memorial Hospital Trust Authority,* 1995 OK 10, 903 P.2d 263, 276, quoting, *Johnson v. Misericordia Community Hospital,* 99 Wis.2d 708, 301

N.W.2d 156, 164 (1981) (whether a hospital possessed a particular duty to investigate and verify statements of applicants for medical staff is based upon foreseeability of an unreasonable risk of harm to patients by not investigating and verifying); *Iglehart v. Board of County Commissioners of Rogers County,* 2002 OK 76, ¶ 10, 60 P.3d 497, 502 (Foreseeability refers to establishes a "zone of risk," which is to say that it forms a basis for assessing whether the conduct "creates a generalized and foreseeable risk of harming others"); *Thing v. LaChusa,* 48 Cal.3d 644, 257 Cal.Rptr. 865, 771 P.2d 814, 819 n. 3 (1989) quoting *Ballard v. Uribe,* 41 Cal.3d 564, 224 Cal.Rptr. 664, 715 P.2d 624, 629 n. 6 (1986) (emphasis in original) ("[A] court's task—in determining 'duty'—is not to decide whether a *particular* plaintiff's injury was reasonably foreseeable in light of a *particular* defendant's conduct, but rather to evaluate more generally whether the category of negligent conduct at issue is sufficiently likely to result in the kind of harm

er sexual abuse of minors is conduct within a foreseeable zone of risk which ecclesiastical employers *should know*.[20] In *Dayton* we used "foresee" with reference to the proximate causation element of negligence, i.e., the causal link between a particular defendant's conduct and the resulting injury of a particular plaintiff.[21]

¶ 41 Causation usually is determined as a question of fact and not of law, and we have stated that "Whether a negligent event's injurious consequences could have been reasonably foreseen presents a jury question ... [but] 'where the evidence together with all inferences which may be properly deduced therefrom is insufficient to show a causal connection between the alleged wrong and the injury' that the issue of proximate cause becomes a question of law." *Lockhart v. Loosen,* 1997 OK 103, ¶ 11, 943 P.2d 1074, 1079–1080. The Archdiocese's argument that Father Imming's alleged sexual abuse was not foreseeable from the conduct that the Archdiocese had notice of presents an issue that is dependent upon the inference made by the trier of fact concerning what a reasonably prudent person would do in the circumstance of the defendant. Since we have explained that the inference is for the trier of fact, the issue of foreseeability is not proper for adjudication by summary judgment. We accordingly reverse the trial court's summary judgment on Schovanec's claim of negligent supervision and retention, and the dismissal of the negligent infliction of emotional distress.[22]

### III. Fiduciary Duty, Vice Principal Doctrine, Civil Conspiracy, and Intentional Infliction of Emotional Distress

¶ 42 In *N.H. v. Presbyterian Church (U.S.A.),* 1999 OK 88, n. 47, 998 P.2d 592, 602 we noted authority discussing the problem of evaluating the contours of a "fiduciary duty" between an ecclesiastical organization and a member thereof. *Id.* at n. 47, 998 P.2d at 602, citing *Langford v. Roman Catholic Diocese of Brooklyn,* 177 Misc.2d 897, 677 N.Y.S.2d 436, 438–39 (1998) (evaluation of fiduciary duty between religious organization and parishioner impermissible under First Amendment.). We had previously noted a similar problem in *Bladen v. First Presbyterian Church of Sallisaw,* 1993 OK 105, ¶ 29, 857 P.2d 789, 795–796, and we explained that "in analyzing and defining the scope of a fiduciary duty owed persons by their clergy, the Court would be confronted by the same constitutional difficulties encountered in articulating the generalized standard of care for a clergyman required by the law of negligence...." *Id.* 857 P.2d at 795.

¶ 43 The negligent supervision claim we address today is in the context of an employer's duty to supervise employees. No First Amendment defense to this claim has been asserted by the Archdiocese that would prohibit it from acting as a non-ecclesiastical

experienced that liability may appropriately be imposed on the negligent party").

**20.** We recognized in *N.H. v. Presbyterian Church (U.S.A.), supra,* that a negligent failure to supervise ecclesiastical employees resulting in harm to parishioners is a cause of action recognized in Oklahoma. *N.H. v. Presbyterian Church (U.S.A.),* 1999 OK 88, ¶¶ 21, 22, 998 P.2d 592, 600–601 (Court discussed facts necessary for plaintiff to show in support of negligent hiring and supervision claim).

**21.** *See, e.g., Stroud v. Arthur Andersen and Company,* 2001 OK 76, ¶ 26, 37 P.3d 783, 791 (material omitted) ("In a negligence action a plaintiff is required to adduce evidence which ... is sufficient (1) to induce a reasonable person to believe that a causal link exists between the defendant's conduct and the resulting injury and (2) to establish the presence of a controverted factual question which should be submitted to the jury"); *Dirickson v. Mings,* 1996 OK 2, 910 P.2d 1015,

1018 (plaintiff must show that the injury plaintiff suffered "resulted directly and proximately from the violation of the duty of care"); *Myers v. Luttrell,* 1961 OK 248, 373 P.2d 22, 25, quoting *O'Neal v. Vie,* 1923 OK 1048, 220 P. 853 (plaintiff must show that the defendant, based upon a reasonable person standard, should have foreseen the likelihood of the injury to the plaintiff caused by, of resulting from, the defendant's breach of a duty to the plaintiff).

**22.** The trial court dismissed Schovanec's claim of negligent infliction of emotional distress. We have explained that in Oklahoma the negligent causing of emotional distress is not an independent tort, but is in effect the tort of negligence. *Lockhart v. Loosen,* 1997 OK 103, ¶ 16, 943 P.2d 1074, 1081. Thus, the claim of negligent infliction of emotional distress is part of Schovanec's negligence claim.

employer. Indeed, it argues that it should be treated as other employers. The argument made by Schovanec on certiorari does not *specifically* address the problem we discussed in *Bladen*, that is, identifying the scope of the fiduciary duty apart from a court assessing particularized denominational standards of conduct as a basis of liability. However one of the four opinions he cites in support of fiduciary duty on the part of an archdiocese to its parishioners, *Doe v. Evans*, 814 So.2d 370 (Fla.2002), states that a fiduciary duty may be adjudicated based upon neutral principles unrelated to religious doctrines. For example, it states that

> Under section 874 of the Restatement (Second) of Torts, Violation of Fiduciary Duty, "[o]ne standing in a fiduciary relation with another is subject to liability to the other for harm resulting from a breach of duty imposed by the relation." Thus, "[a] fiduciary who commits a breach of his duty as a fiduciary is guilty of tortious conduct to the person for whom he should act.... [T]he liability is not dependent solely upon an agreement or contractual relation between the fiduciary and the beneficiary but results from the relation." Restatement (Second) of Torts § 874 cmt. b (1979). Moreover, "[a] fiduciary relation exists between two persons when one of them is under a duty to act for or to give advice for the benefit of another upon matters within the scope of that relation." *Id.* at cmt. a.

*Id.* 814 So.2d at 374.

This indicates the duty to act for or give advice for the benefit of another upon matters within the scope of a fiduciary relation. Schovanec attempts to define the scope of the fiduciary relationship to include duties on the Archdiocese to investigate and monitor Father Imming's daily activities. However, we need not address this argument further, because there is no evidentiary support for a breach of a fiduciary claim.

 ¶ 44 The Archbishop and Archdiocese contend that no fiduciary duty exists. The testimony of Archbishop Beltran is that a "bond of trust" exists between "a priest who's providing counseling and the person they are providing counseling to." O.R. Vol. III Tab 12, Exhibit 30 at 87–88. Schovanec argued on summary judgment that the archdiocese "admits this special bond of trust, confidence, and reliance exists between a parishioner, his priest, church, and diocese." Tab 12, at 5, citing, Exhibit 31 at 34–35 and Exhibit 30 at 87–88. The materials cited do not clearly state what Schovanec represents them to state. The referenced two exhibits are the depositions of Archbishops Beltran and Quinn. Archbishop Quinn was asked whether "there is a special bond of trust between that parishioner and his church or Archdiocese?" After objections to the form of the question, the Archbishop answered "Yes." No other questions were asked relating to this "bond of trust" or facts relating to the parishioner-archdiocese relationship, or exactly what the witness understood and meant by the phrase "bond of trust." A similar and more indirect form of the question was asked of Archbishop Beltran, "Would you agree with me, Archbishop, that there is a bond of trust between a bishop— or, excuse me, between a priest who's providing counseling and the person they are providing counseling to?" After the objections to the form of the question, the Archbishop stated "Yes." No other questioning on the specific relationship of parishioner-archdiocese was made. No facts are presented on the nature of a confidential relationship allegedly existing between Schovanec and the Archdiocese. No facts appear in the summary judgment record to show the existence of a confidential or fiduciary relationship between the archdiocese and Schovanec. The existence of fiduciary or confidential relationship is usually highly fact-specific and determined by a jury, *Sellers v. Sellers*, 1967 OK 34, 428 P.2d 230, 236, unless the evidence will not support sending the issue to the jury, *Shoemaker v. Estate of Freeman*, 1998 OK 17, ¶¶ 26–27, 967 P.2d 871, 877. We affirm that part of the summary judgment on Schovanec's fiduciary relationship claim.[23]

---

23. Father Imming is not a party to the present appeal and the relationship between Schovanec and Father Imming is not before us at this time for analysis of Schovanec's theories of duty and liability.

¶ 45 Schovanec argues that the Archdiocese and the Archbishop are liable for the sexual abuse based upon the doctrine or theory of vice principal. A vice principal is the representative and alter ego of the principal, his master. *Chap–Tan Drilling Co. et al. v. Myers,* 1950 OK 304, 225 P.2d 373, 375. The doctrine was used to establish liability on the part of the master or employer for the injury caused by one employee against another employee. For example, we stated the following:

> The law presumes that all persons engaged in the common employment of the same master, though different in rank, are fellow servants, and the burden is on him who claims damages for an injury caused by the negligence of one employed by the same master to show that his co-employé is a vice principal and stands in the place of the master.

*Mollhoff v. Chicago, R.I. & P.R. Co.,* 1905 OK 78, 82 P. 733 (Syllabus by the Court). None of the Oklahoma opinions cited by Schovanec move the duty-liability regime beyond the employment relationship, and no cogent argument is made for the necessity or desirability of such a move. We decline to research the argument further, *Fent v. Contingency Review Board,* 2007 OK 27, nn. 58, 59, 163 P.3d 512, 525, and affirm the trial court's summary judgment on Schovanec's vice principal claim.

¶ 46 Schovanec also alleged that the Archdiocese is liable based upon a theory of civil conspiracy. In *Brock v. Thompson,* 1997 OK 127, 948 P.2d 279, we stated that "A civil conspiracy consists of a combination of two or more persons to do an unlawful act, or to do a lawful act by unlawful means" and we noted that a common-law action for civil conspiracy was also recognized in Texas. *Brock,* at n. 66, citing *Closs v. Goose Creek Consol. Indep. School Dist.,* 874 S.W.2d 859, 871 (Tex.App.-Texarkana 1994, no writ). *Closs* states the following:

> Actionable civil conspiracy is a combination by two or more persons to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means. *Massey v. Armco Steel Co.,* 652 S.W.2d 932, 934 (Tex.1983). The essential elements are: (1) two or more persons; (2) an object to be accomplished; (3) a meeting of minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as the proximate result. *Id. Civil conspiracy is an intentional tort. Id.* at 933. As a general rule, an actionable conspiracy must consist of wrongs that could have been actionable against the individual conspirators.

*Closs,* 874 S.W.2d at 871–872 (emphasis added).

¶ 47 Facts relating to intent are also necessary for Schovanec's claim of intentional infliction of emotional distress. For example, in *Computer Publications, Inc. v. Welton,* 2002 OK 50, 49 P.3d 732, we stated the following.

> ¶ 7 Oklahoma first adopted the tort of intentional infliction of emotional distress, also known as the tort of outrage, in *Breeden v. League Services Corp.,* 1978 OK 27, 575 P.2d 1374. The tort is governed by the narrow standards of the Restatement (Second) of Torts § 46.[FN2] *Id.* The tort requires evidence of extreme and outrageous conduct coupled with severe emotional distress. *Gaylord Entertainment Co. v. Thompson,* 1998 OK 30, ¶ 45, 958 P.2d 128, 149. To recover damages for intentional infliction of emotional distress, a plaintiff must prove: (1) the defendant acted intentionally or recklessly; (2) the defendant's conduct was extreme and outrageous; (3) the defendant's conduct caused the plaintiff emotional distress; and (4) the resulting emotional distress was severe.

*Id.* at ¶ 7, 49 P.3d at 735.

We then stated the following.

> "The court, in the first instance, must determine whether the defendant's conduct may reasonably be regarded as *so extreme and outrageous* as to permit recovery or whether it is necessarily so. Where, under the facts before the court, reasonable persons may differ, it is for the jury, subject to the control of the court, to determine whether the conduct in any given case has been significantly extreme and outrageous to result in liability. Likewise, it is for the

court to determine, in the first instance, whether based upon the evidence presented, *severe emotional distress* can be found. It is for the jury to determine whether, on the evidence, severe emotional distress in fact existed."

*Computer Publications,* at n. 8, 49 P.3d at 735, quoting *Miller v. Miller,* 1998 OK 24, ¶ 34, 956 P.2d 887, 901.

Again, we are called to determine if there is an entire absence of facts and inferences therefrom on this issue. Schovanec essentially argues that the priests who knew of the skinny-dipping, boys temporarily residing with Father Imming, and parties in the rectory stated that they did not, or would not have, reported Father Imming to the Archbishop. On the other hand, some priests who did not know of these activities stated that they would have reported it to the Archbishop had they only known. Schovanec cites to a priest's deposition stating that the priest did not want to make trouble for Father Imming, and the conclusion he draws from the testimony is that the Archdiocese had a pattern of concealment.

 ¶ 48 Paraphrasing *Rodebush v. Oklahoma Nursing Homes, Ltd.,* 1993 OK 160, 867 P.2d 1241, as a general rule, it is not within the scope of an employee's employment to commit an intentional tort upon a third person. *Id.* at 1245. We then stated that:

> However, this general rule does not apply when the act is one which is "fairly and naturally incident to the business", and is done "while the servant was engaged upon the master's business and be done, although mistakenly or ill advisedly, with a view to further the master's interest, or from some impulse of emotion which naturally grew out of or was incident to the attempt to perform the master's business." ... An employee's act is within the scope of employment if it is incident to some service being performed for the employer....

*Rodebush,* 867 P.2d at 1245 (citations omitted).

The deposition testimony is clear that one of the functions of a priest acting within the scope of his duty is to report the improper conduct of another priest. The motion and brief for summary judgment on the civil conspiracy and intentional infliction of emotional distress is sought based upon the concept that no knowledge of the Archdiocese's priests or employees (such as Carole Goodwin) may be attributed to the Archdiocese. We have rejected that view herein. The party seeking summary judgment has the burden to establish that no genuine issue exists as to any material fact. *Reeds v. Walker,* 2006 OK 43, ¶ 32, 157 P.3d 100, 116. The burden of the party opposing summary judgment is not a "mirror image" of the burden imposed on a party seeking summary judgment. For example, in *Copeland v. Lodge Enterprises, Inc.,* 2000 OK 36, 4 P.3d 695, we stated the following.

> While the mere contention that material facts are in dispute is not sufficient to defeat a plea for summary judgment, neither is the nonmovant to be held to the standard of producing forensic evidence. The nonmovant must merely "present something which shows that when the date of trial arrives, he will have some proof to support his allegations." For an item of evidentiary material to be insufficient to defeat a motion for summary judgment, it must either facially lack probative value or be incapable of conversion at trial to admissible evidence.

*Id.* at ¶ 9, 4 P.3d at 699, footnotes omitted and quoting *Davis v. Leitner,* 1989 OK 146, ¶ 13, 782 P.2d 924, 926.

Schovanec testified of his past and continuing therapy and that he sought funds from the defendants to pay for the therapy. Given the evidence of sexual abuse, the evidence that priests knew of certain conduct (and that reasonable minds could differ on whether the conduct was actual notice of sexual abuse), Father's Imming's known reputation to Archbishop Salatka of not complying with directions from the Archbishop, and the priests' duty of reporting conduct to the Archbishop, we conclude that summary judgment was erroneously granted to the Archbishop and the Archdiocese on Schovanec's claims of civil conspiracy and intentional infliction of emotional distress. We reverse the trial court's judgment on those claims.

### IV. Conclusion

¶ 49 In summary, the trial court's judgments for the Archbishop and Archdiocese on the claims of negligent supervision and retention, intentional infliction of emotional distress, and civil conspiracy are reversed. In all other respects, the summary judgments are affirmed. The cause is remanded to the District Court of Oklahoma County for future proceedings consistent with this opinion.

¶ 50 EDMONDSON, V.C.J., OPALA, KAUGER, WATT, TAYLOR, COLBERT, JJ., Concur.

¶ 51 WINCHESTER, C.J., Dissents.

¶ 52 HARGRAVE, REIF, JJ., Disqualified.