Filed 10/7/15 Unmodified opinion attached

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| S.M., a Minor, etc., | B253983 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BC477194) |
| v. | |
| LOS ANGELES UNIFIED SCHOOL DISTRICT, | ORDER MODIFYING OPINION AND DENYING PETITION FOR REHEARING |
| Defendant and Respondent. | [NO CHANGE IN JUDGMENT] |

THE COURT:

It is ordered that the opinion filed herein on September 16, 2015, be modified as follows on page 16, line 8 to read:

**Under the facts of this case, plaintiff was required to show only that Hermida had the *potential* to sexually abuse minors.**

Petition for Rehearing is denied. No change in judgment.

_____

KIRSCHNER, J.[*]                                    KRIEGLER, Acting P.J.

_____

[*]     Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Filed 9/16/15 Unmodified opinion

## CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| S.M., a Minor, etc., | B253983 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BC477194) |
| v. | |
| LOS ANGELES UNIFIED SCHOOL DISTRICT, | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Lawrence H. Cho, Judge.  Reversed and remanded.

Perez & Caballero, Frank J. Perez and Miguel G. Caballero; Law Office of Shea S. Murphy, Shea S. Murphy; Esner, Chang & Boyer, Stuart B. Esner and Holly N. Boyer for Plaintiff and Appellant.

Horvitz & Levy, H. Thomas Watson and Karen M. Bray; Andrade Gonzalez, Sean A. Andrade for Defendant and Respondent.

This appeal is brought by S.M. (plaintiff) from a judgment in favor of the Los Angeles Unified School District (the District) on a cause of action for negligent supervision of a teacher employed by the District, who sexually abused plaintiff on and off campus over several months while she was attending Edison Middle School (the school). We reverse the judgment and remand the matter for a new trial.

## STATEMENT OF CONTENTIONS

Plaintiff appeals from the judgment in favor of defendant, the District, contending the court erred prejudicially by (1) modifying CACI No. 426 to require plaintiff to prove that her teacher had displayed a "dangerous propensity to sexually abuse minors;" (2) permitting admission of evidence of plaintiff's sexual history; (3) instructing the jury that plaintiff could be found comparatively at fault if she "consented" to sex with her teacher; (4) instructing the jury that the teacher's intentional torts against plaintiff could be a superseding cause of her injuries; and (5) instructing the jury on discretionary immunity.

## FACTS

a. *Undisputed Facts Concerning the Sexual Abuse of Plaintiff*

In the fall of 2010, plaintiff was a thirteen-year-old student in the eighth grade at the school. Her math teacher was Elkis Hermida (Hermida). In October 2010, Hermida invited plaintiff to be friends on a social networking site. Soon, the two began exchanging direct text messages on their cell phones. Over time, the messages turned sexual. Plaintiff turned 14 on December 13, 2010.

In late 2010 or early 2011, Hermida told plaintiff to come to his classroom during his conference period when he did not have class. He told her to tell her teacher that she had to use the bathroom. She complied. When plaintiff entered Hermida's classroom, he told her to shut the door. He hugged and kissed her.

About a week later, Hermida again texted plaintiff and told her to come to his classroom. She complied, and he again kissed her.

2

Hermida subsequently approached plaintiff at her desk at the end of math class and told her that she needed to stay after class. He dismissed the other students, closed the door and kissed her. He told her that he wanted to have sex with her.

On March 12, 2011, plaintiff told her mother that she was going to a friend's house. However, plaintiff left the friend's house and met Hermida across the street from the school. He drove her to a motel where they had sexual intercourse.

They also had sexual intercourse at the school. Hermida texted plaintiff and told her to come to his classroom. He had arranged the furniture in the classroom so that they could have sex in a hidden alcove in the room and no one would see them. They had oral and vaginal sex in the classroom with the door closed.

The next time they had sexual intercourse was on a Saturday at a motel. Hermida told her that they were not in a relationship but were just having sex. At this point, plaintiff wanted to stop having sexual intercourse with Hermida, but did not feel that she was free to do so.

The fourth time they had sexual intercourse was also at a motel. Hermida wanted to have anal sex. Plaintiff objected, but Hermida inserted something into her anus anyway.

During the time that Hermida and plaintiff were having sexual intercourse, Hermida sent nude photographs of himself to plaintiff. He requested and received nude photos of plaintiff. At one point he sent her a video of him masturbating.

In May 2011, one of plaintiff's friends told a teacher about the relationship between plaintiff and Hermida. The teacher reported the abuse the next day.

Hermida was promptly arrested. He pled no contest to one count of lewd acts upon a victim aged 14 in violation of Penal Code section[1] 288, subdivision (c)(1) and served time in prison.

---

[1] All further unspecified references are to the Penal Code.

3

b. *Hermida's Conduct at School*

The District's "Code of Conduct with Students" provides that "[t]he most important responsibility of the . . . (District) is the safety of our students." The Code of Conduct states: "All employees, as well as all individuals who work with or have contact with students, are reminded that they must be mindful of the fine line drawn between being sensitive to and supportive of students and a possible or perceived breach of responsible, ethical behavior." The Code of Conduct outlines certain conduct, which teachers are "cautioned to avoid," including "[e]ngaging in any behaviors, either directly or indirectly with a student(s) or in the presence of a student(s), that are unprofessional, unethical, illegal, immoral, or exploitive" as well as "[t]ouching or having physical contact with a student(s) that is not age-appropriate or within the scope of the employee's/individual's responsibilities and/or duties."

The Code of Conduct further provides: "Even though the intent of the employee/individual may be purely professional, those who engage in any of the above behavior(s), either directly or indirectly with a student(s) or in the presence of a student(s), are subjecting themselves to all possible perceptions of impropriety. Employees/individuals are advised that, when allegations of inappropriate conduct or behavior are made, the District is obligated to investigate the allegations, and, if warranted, take appropriate administrative and/or disciplined [*sic*] action."

While the District presented evidence that these were only "guidelines" for teachers, which was disputed by other testimony, Vice Principal Garcia testified that if it is reported that a teacher has violated one of the behaviors advised against in the Code of Conduct, the District is obligated to "meet with the individual at that time and find out the facts of what the allegations are." Garcia testified that if someone had reported to an administrator an appearance of impropriety, the District would have to investigate the claim, which would include interviewing the teacher, the victim, witnesses, and other individuals, as well as gathering information in order to determine the truth of the allegation.

4

Plaintiff presented several instances of conduct by Hermida which she contended violated the Code of Conduct, were "red flags" and should have alerted the District that Hermida posed a risk of harm to students.

### i. *Classroom atmosphere*

Ruby A., who was in plaintiff's eighth grade class, testified that Hermida would often talk about his personal life, including drinking, going out with friends, problems with his girlfriend, and other topics with Ruby and her girlfriends. Ruby also testified that she repeatedly saw Hermida acting inappropriately with female students during his after school math tutoring sessions. She saw Hermida touching or caressing the hands of female students in a sexual way.

Fraulein Manligas, a teacher at the school, testified that some of her female students told her that they thought Hermida was cute. Manligas also testified that when she would walk by Hermida's afternoon tutoring sessions, she noticed it was mostly girls in his classroom. Manligas and other teachers "had a general agreement that he had a lot of girls in his room." She further testified that too many girls in a classroom may have looked bad for Hermida's reputation. When asked why she never reported this, Manligas testified: "Why would I report a lot of girls in his tutoring, as something that's improper? . . . [T]hat's not child abuse."

### ii. *Hugging*

Several students, including Ruby, testified that Hermida would regularly hug certain girls as they came into his classroom. Jean C., who was in plaintiff's class, testified that he saw Hermida hugging girls during passing periods, lunch break and in class. Hermida would only hug some of the girls. Jean stated that Hermida would hug the girls every day, and that he did it in front of other teachers and students. According to Jean, Mr. Agawal, whose classroom was directly across the hall from Hermida's classroom, was sometimes in the hallway when Hermida was hugging girls.

Ruby explained that Hermida's hugs with female students were "face to face" with both arms around the girls. She explained that as she was going to the classroom next door, she would witness him openly hugging girls as they came into his classroom. When asked what she thought of this, she said it was not right "[b]ecause he was the only teacher doing it."

Ruby also testified Ms. La Conde and Agawal were present in the hallway when Hermida hugged girls. Once, Hermida hugged plaintiff in the hallway while in the middle of a conversation with Agawal. Ruby estimated that she saw Hermida hug plaintiff more than ten times at school.

Hermida himself admitted that he routinely hugged girls as they came into his classroom during passing period and other teachers were in the hallway when he engaged in such behavior. He further testified that no one from the school ever said anything to him about such behavior.

Evidence at trial revealed that teachers were required to stand outside their classrooms during passing period. The District presented evidence that neither La Conde nor Agawal saw Hermida hugging female students.

Vice Principal Garcia testified that if a teacher had witnessed another teacher hugging students on a regular basis as they entered the classroom, such conduct would be inappropriate and should have been reported to an administrator. He also testified that if a teacher routinely hugged students entering the classroom, such behavior would violate the Code of Conduct.

### iii. *Lying on classroom table*

Andrea Mordoh, a teacher at the school, testified that she witnessed "unprofessional" conduct by Hermida and reported it to the school principal, Coleen Kaiwi. Mordoh explained that as she was walking by his classroom, she saw Hermida "lying on his back on one table and he had his cell phone. To me, it looked like he was texting. And there were two female students sitting at the table next to the table he was

6

lying on, and they were working on something or talking." Mordoh testified that she felt the conduct was unprofessional. She noted that the fact that it was two female students, and not a mix of male and female students, alarmed her and gave rise to the appearance of impropriety. Mordoh later told her lunch group, which consisted of three other teachers at the school, of Hermida's inappropriate conduct.

Mordoh testified that the conduct she witnessed with Hermida lying on his back in his classroom with female students was conduct falling within the provision of the Code of Conduct prohibiting employees from engaging in behavior that is "unprofessional, unethical, illegal, immoral, or exploitive."

The District never conducted any investigation following Mordoh's report of unprofessional conduct by Hermida. Principal Kaiwi never talked to Hermida about the incident and testified that she does not remember receiving such a report from Mordoh.

     iv. *Furniture arrangement*

Hermida admitted that before he had sex with plaintiff, he rearranged the furniture in his classroom which created a hidden alcove. He kept his furniture in this arrangement through the spring semester. The layout of the furniture and the hidden alcove would have been visible to others visiting his classroom. Hermida stated that he received comments from coworkers about the furniture layout. According to Hermida, he was also often visited by school administrators during the time when the hidden alcove existed. It was in this hidden alcove that Hermida actually had sex with plaintiff.

Vice Principal Garcia testified that if a teacher arranged the furniture in his or her classroom such that a hidden alcove was created, such behavior would be inappropriate and unacceptable and would necessitate a discussion with the teacher to dismantle the hidden area.

The District put on evidence that at the school there were formal and informal pop-ins of the classrooms. Informal pop-ins are not recorded. Principal Kaiwi testified that while she is positive she visited Hermida's class for an observation, she had no

7

record of it. She also did not recall if she ever informally observed Hermida during his after school tutoring sessions. Vice Principal Garcia testified that he popped into Hermida's classroom once or twice during the time when Hermida was a teacher at the school.

    c. *School Experts*

Plaintiff's school safety expert, Davis Cowles, testified that in his opinion "even though the District had good guidelines and a good code of conduct in place, they didn't place a high priority on the potential for teacher misconduct towards students. And I felt that had that been in place, been a more important priority for the administration, that this whole thing may have been avoided."

Cowles testified that there were several red flags—the fact that Hermida openly hugged female students, his rearrangement of the furniture in his classroom, and the incident reported by Mordoh where he was inappropriately lying on the desk with two female students—which should have been addressed by the District either with heightened supervision of Hermida or at least a discussion with him about appropriate conduct.

Cowles explained that the District "allowed an environment where the potential for this kind of misconduct could take place." For example, despite the fact that a student and teacher should not be alone in a classroom with the door shut, an act prohibited by the Code of Conduct, the school administrators were not concerned with such behavior and did not really enforce this prohibition. This lack of concern was shown in Vice Principal Garcia's testimony that he did not believe that a teacher alone with a student in a classroom with the door closed was a violation of the Code of Conduct.

A lack of concern was also shown by Principal Kaiwi's testimony that there was no rule against a teacher closing and locking their door during a conference period. Principal Kaiwi testified that if she passed a classroom where the teacher had locked the door, it would not raise any red flags to her. When asked if it would cause her concern if

she were to open a locked classroom and discover the teacher was alone with a student in the room, she testified: "Well, it would concern me to the point where I would think I was interrupting a private conversation."

The District's school supervision expert, Edward Sussman, testified that the District "reasonably supervised . . . Hermida and the plaintiff at the time of the sexual relationship, that they—the school—had no prior knowledge there was any relationship between the plaintiff and . . . Hermida, and that they had kept their relationship a complete secret." He stated that "in my opinion, it is very difficult, if not impossible, to determine if two people, whether it be students, teachers, or student-teacher relationship that want to disregard rules and behaviors, it's almost impossible for the school to really do anything about it unless they know this is going on."

Sussman testified that teachers "must" adhere to the bullet points describing the inappropriate behavior in the Code of Conduct. He agreed that under the Code of Conduct, the District must investigate allegations of inappropriate conduct. Although Sussman at times contradicted his own testimony, stating at one point that the Code of Conduct was merely a guideline and not a set of prohibitions, he later agreed that behavior described in the Code of Conduct referring to a teacher not engaging in conduct that is "unprofessional, unethical, illegal, immoral, or exploitative" is "obviously something that you need to follow." He further clarified that nothing says that the inappropriate conduct must be "sexual" to trigger an investigation.

d. *Damages*

At trial, plaintiff described the emotional distress she suffered and continues to suffer as a result of the abuse.

Dr. Lilli Friedland, a board certified psychologist, elaborated on plaintiff's testimony, explaining that although plaintiff had already received some counseling for the abuse, she will need further therapy throughout her life. Dr. Friedland testified, "because she's so not used to thinking about what's going on inside of her. She's usually thinking

of focusing on the other person. So she will need a great deal of psychological help right now. And almost definitely, without any reasonable doubt, she will need it at different periods of time in her life when she encounters other developmental stages and other situations."

Dr. Friedland further explained that aspects of plaintiff's personality, her obedience to authority, and her loneliness (caused by changing schools and being teased) made her vulnerable to this type of abuse. Dr. Friedland testified that, "she was brought up to believe in authority and this man—and power. She adored him. He really listened to her." "[Hermida] made all the overtures. He was the one who initiated the personal discussions and the personal examples and telling of secrets. He made all the plans." The detective that interviewed plaintiff and conducted the investigation into the abuse testified that he would refer to Hermida's conduct—his behavior as a school teacher, as somebody in a position of trust, who befriends a child in order to then sexually abuse the child—as grooming.

Dr. Stan Katz, the clinical and forensic psychologist hired by the District, presented a contrary view of plaintiff's damages, testifying that "there was no indication in any of the data that . . . she . . . experienced a life-threatening event." Dr. Katz testified that he believed the relationship made plaintiff more mature. "It always matures someone because you have to go through experiences which most teenagers don't have to deal with. So you learn by experience." When asked his opinion as to plaintiff's future prognosis, he stated that plaintiff is doing "quite well" and likely will not need future counseling as a result of the abuse.


e. *Verdict*

After a two week trial, the jury returned a verdict in the District's favor. As to the first question, which asked "[w]as defendant . . . District negligent?" the jury answered "No" by a vote of ten to two.

Judgment was entered for the District, and this appeal timely followed.

## CONTENTIONS ON APPEAL

a. *Instructions Concerning Negligent Supervision*

Plaintiff contends the trial court erred in modifying CACI No. 426 concerning negligent hiring, supervision or retention of an employee to require plaintiff to prove that Hermida had a "dangerous propensity to sexually abuse minors." Respondent contends that plaintiff is barred from raising this claim by the doctrine of invited error. We see no bar to plaintiff's claim. We agree the trial court erred prejudicially. Plaintiff was only required to prove that Hermida had the *potential* to sexually abuse minors, not a "propensity" to do so.

i. *Instruction*

The standard version of CACI No. 426 provides:

"[Name of plaintiff] claims that [he/she] was harmed by [name of employee] and that [name of employer defendant] is responsible for that harm because [name of employer defendant] negligently [hired/ supervised/ [or] retained] [name of employee]. To establish this claim, [name of plaintiff] must prove all of the following:

1) That [name of employee] was [unfit/ [or] incompetent] to perform the work for which [he/she] was hired;

2) That [name of employer defendant] knew or should have known that [name of employee] was [unfit/ [or] incompetent] and that this [unfitness/ [or] incompetence] created a particular risk to others;

3) That [name of employee]'s [unfitness/ [or] incompetence] harmed [name of plaintiff]; and

4) That [name of employer defendant]'s negligence in [hiring/ supervising/ [or] retaining] [name of employee] was a substantial factor in causing [name of plaintiff]'s harm.

The trial court replaced the phrase "unfit/[or] incompetent" with the phrase "dangerous propensity to sexually abuse minors[.]"

11

ii. *Invited error*

The invited error doctrine bars a party from challenging an instruction to which the party stated it had no objection. (*Electronic Equipment Express, Inc. v. Donald H. Seiler & Co.* (1981) 122 Cal.App.3d 834, 856.) That did not occur here.

The District sought two changes to CACI No. 426, arguing that the "knew or should have known" requirement in the instruction should be changed to the higher standard of "knew or had reason to know" and the general term "unfit" should be changed to require prior acts of sexual misconduct. The arguments were not unrelated. As the court recognized, in situations requiring a "had reason to know standard," the prior conduct giving rise to a "reason to know" had to be unambiguous. In this context, that would mean prior acts of sexual misconduct. The court found, however, that the appropriate standard in this case was "should have known." The District submitted on that ruling, but continued to argue vigorously for "unfit" to be replaced by "had committed prior acts of sexual misconduct."

Plaintiff argued repeatedly that the "unfit" language of the instruction was clear and did not need to be modified. She argued, "It's my position that 426 adequately discussed the law. There is nothing confusing about it that would confuse the jury or mislead the jury. . . . " "CACI is very well thought out. CACI is—the Judicial Council. . . . And this is what they came up with based on the interpretation of the law as it stands, Your Honor." "It's up to the jury to define fit or unfit, Your Honor." Although plaintiff occasionally stated during argument about this jury instruction her belief that Hermida had exhibited a "propensity" for sexual misconduct, at no point did she concede that the law required her to prove that Hermida exhibited such conduct as an element of her claim. To the contrary, she specifically argued that the law did not require her "to show the propensity to have sexual misconduct. It doesn't say the propensity to do any specific conduct."

The court found that applicable law was contained in *C.A. v. William S. Hart Union High School District* (2012) 53 Cal.4th 861 (*C.A.*) and *In re Veronica G.* (2007)

12

157 Cal.App.4th 179 and that the District "knew or should have known about this particular risk is what the law mandates." At the end of argument, the court ruled that it was going to change CACI No. 426 and was going to "try to track the language of *C.A.* [*v.*] *William Hart* as close as I can in crafting my own version of 426. . . . " The court stated that it would give the modified version of the instruction to the parties later.

When the parties were later given the court's modified version of CACI No. 426, that instruction in fact used the "dangerous propensity" language taken from *C.A.* Plaintiff did not object. Since plaintiff had already argued that such language was not required, her acquiescence to the instruction does not support a finding of waiver, forfeiture or invited error. (*Mary M. v. City of Los Angeles* (1991) 54 Cal.3d 202, 212-213 ["""An attorney who submits to the authority of an erroneous, adverse ruling after making appropriate objections or motions, does not waive the error in the ruling by proceeding in accordance therewith and endeavoring to make the best of a bad situation for which he was not responsible"""].)

### iii. *Modification*

"When a party challenges a particular jury instruction as being incorrect or incomplete, 'we evaluate the instructions given as a whole, not in isolation.' (*People v. Rundle* (2008) 43 Cal.4th 76, 149.) "' For ambiguous instructions, the test is whether there is a reasonable likelihood that the jury misunderstood and misapplied the instruction.'" (*Ibid*.) The propriety of jury instructions is a question of law that we review de novo." (*Cristler v. Express Messenger Systems, Inc.* (2009) 171 Cal.App.4th 72, 82.)

Here, the harm that plaintiff suffered was sexual abuse. There must be a nexus in the instruction between the harm suffered by plaintiff and the unfitness of Hermida as a teacher. The trial court correctly ruled that plaintiff was *not* required to show that Hermida was unfit to be a teacher because he had committed prior acts of sexual

13

misconduct. The trial court undercut its ruling, however, when it defined Hermida's unfitness as a "dangerous propensity to sexually abuse minors."

There is a reasonable probability that the jury misunderstood the propensity phrase to require prior acts of sexual misconduct. A common meaning of propensity is "a disposition to behave in a certain way." (American Heritage Dictionary (2011) <www.thefreedictionary.com> [as of Sept. 8, 2015].) "If you have a propensity for something, then it's something that comes naturally to you or *something you just do a lot*." (Vocabulary.com (2015) <www.vocabulary.com> [as of Sept. 8, 2015], italics added.) Thus, the use of the phrase "propensity to sexually abuse minors" strongly indicates that sexually abusing minors was something that Hermida did with some frequency. This is more than the law required plaintiff to prove.[2] Plaintiff was only required to prove that Hermida had the *potential* for sexually abusing minors.

The District contends the use of the phrase "propensity" was not misleading when considered with several other instructions which correctly state general principles of tort law, such as "[f]oreseeability is determined in light of all the circumstances and does not require prior identical acts or injuries," and a school district may be liable if "it knew or should have known that the teacher posed a foreseeable risk of harm to students." The

---

[2]    In *C.A.*, upon which the trial court relied for the propensity language, the plaintiff alleged that the school counselor who abused him had engaged in unlawful sexually-related conduct with minors in the past and the school district knew or should have known or were put on notice of the counselor's past sexual abuse of minors and her "propensity and disposition" to engage in such abuse. (*C.A., supra*, 53 Cal.4th at p. 866.) The issue before the Supreme Court in *C.A.* was whether the plaintiff's theory of liability for negligent hiring, retention and supervision was a *legally* viable one. The court concluded that "a public school district may be vicariously liable under section 815.2 for the negligence of administrators or supervisors in hiring, supervising and retaining a school employee who sexually harasses and abuses a student. Whether plaintiff in this case can prove the District's administrative or supervisory personnel were actually negligent in this respect is not a question we address in this appeal from dismissal on the sustaining of a demurrer." (*Id.* at p. 879.) Thus, *C.A.* cannot be read as requiring "proof of a dangerous propensity to sexually abuse minors" in a negligent supervision cause of action.

District contends that these instructions would have told the jury that plaintiff was not required to prove prior acts of sexual misconduct by Hermida.

The jury in this case was given a number of very general instructions on foreseeability under tort law, which was followed by one quite specific instruction which was titled with the cause of action in this case, used the names of the parties in this case, and referred to the specific wrongful conduct alleged in this case. This specific instruction does not use the term "foreseeability." There is no reason to believe that the jury somehow "mentally corrected" the more specific instruction to conform with the general tort principles set forth in earlier instructions.

iv. *Prejudice*

As we have explained, it is reasonably likely that the jury understood the propensity language of the modified CACI No. 426 to require proof of prior acts of sexual misconduct by Hermida. This likelihood was increased by the District's argument suggesting that prior sexual misconduct was key to foreseeing Hermida's sexual abuse of plaintiff. The District argued that "[T]hey don't have any acts of sexual misconduct, clear acts of sexual misconduct by . . . Hermida that would give [the District] notice." The District also argued, "And the question you have to answer is, should [school] administrators or teachers have foreseen sexual misconduct by . . . Hermida? Okay. Well, what had he done by way of sexual misconduct before?" The District further argued, "Hermida had no past history of sexual misconduct. . . . "

The modified version of CACI No. 426, as argued by the District and as likely misunderstood by the jury, thus set up an insurmountable hurdle for plaintiff. It required her to prove that the District knew that Hermida had a dangerous propensity to sexually abuse minors. It is difficult to see how such a propensity could be shown except by past acts of sexual abuse of a minor.

Since plaintiff was Hermida's first known victim, she could not prove that he had committed past acts of sexual abuse and so could not have shown that he had a dangerous

15

propensity to sexually abuse minors. Indeed, no first victim of a predatory teacher would have a remedy, since he or she could not prove propensity. This is not the law.

A miscarriage of justice occurs if, based on the entire record, including the evidence, it is reasonably probable the jury would have reached a result more favorable to plaintiff absent the error. (*Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 800.) Probability here "does not mean more likely than not, but merely a reasonable chance, more than an abstract possibility.' [Citation.]" (*Ibid*.)

Plaintiff was required to show only that Hermida had the *potential* to sexually abuse minors. There were several actions by Hermida which could have shown such a *potential*. Hermida's acts of openly hugging female students could be found to have shown such *potential*, as could his rearrangement of the furniture in his classroom to create a hidden alcove, his lying on his back on one of the tables in his classroom while two female students were sitting at the table, and his discussion of his personal life, including drinking and problems with his girlfriend with his female students. There is a reasonable chance that plaintiff would have obtained a more favorable result in the absence of the erroneous instruction. Reversal is required.


b. *Plaintiff's Sexual History*

Plaintiff contends the trial court erred prejudicially in admitting evidence of her prior sexual history. We agree.


i. *Law concerning the discovery and use of a plaintiff's sexual history*

In 1985, the Legislature added sections 783 and 1106 to the Evidence Code and section 2036.1 to the Code of Civil Procedure. (See *Knoettgen v. Superior Court* (1990) 224 Cal.App.3d 11, 13.)

Code of Civil Procedure section 2017.220, subdivision (a), which derives from section 2036.1, expressly provides, "any party seeking discovery concerning the plaintiff's sexual conduct with individuals other than the alleged perpetrator shall

16

establish specific facts showing that there is good cause for that discovery, and that the matter sought to be discovered is relevant to the subject matter of the action and reasonably calculated to lead to the discovery of admissible evidence."

Evidence Code section 1106, subdivision (a) expressly provides, "opinion evidence, reputation evidence, and evidence of specific instances of plaintiff's sexual conduct . . . is not admissible by the defendant . . . to prove . . . the absence of injury to the plaintiff, unless the injury alleged by the plaintiff is in the nature of loss of consortium."

"The purpose of this legislation, though probably self-evident, was eloquently stated by the Legislature:  'The discovery of sexual aspects of complainant's lives . . . has the clear potential to discourage complaints and to annoy and harass litigants.  That annoyance and discomfort, as a result of defendant[s'] . . . inquiries, is unnecessary and deplorable.'" (*Knoettgen v. Superior Court, supra,* 224 Cal.App.3d at p. 13.)  The Legislature concluded, "'the use of evidence of a complainant's sexual behavior is more often harassing and intimidating than genuinely probative, and the potential for prejudice outweighs whatever probative value that evidence may have.  Absent extraordinary circumstances, inquiry into those areas should not be permitted, either in discovery or at trial.' (Stats. 1985, ch. 1328, § 1, pp. 4654-4655.)" (*Id.* at p. 14.)

ii. *Trial court's rulings*

In February 2013, the Honorable Suzanne Bruguera held a hearing on the District's motions to compel the mental examination of plaintiff and to permit questioning of plaintiff about her sexual history.  The motion to permit questioning about her sexual history was denied.

In October 2013, plaintiff made a motion to preclude evidence of her sexual history apart from Hermida.  The motion was heard by the Honorable Lawrence Cho, who presided at the trial of this matter.  At the hearing on the motion, plaintiff's counsel explained that although there were some interrogatory responses suggesting that the

17

abuse might affect plaintiff's future romantic relationships, "we basically waived that when we were proceeding on in discovery and trying to exclude any inquiry into her sexual history." Referring to the earlier hearing on discovery of plaintiff's sexual history, the District's attorney stated, "we were precluded from obtaining that type of information from plaintiff, not from anybody else."

The District's counsel argued that plaintiff's sexual history was relevant even if she did not seek damages related to future romantic relationships. They contended that "when she's claiming emotion[al] distress from having been involved in a sexual relationship with a teacher but she's also having sexual relations with other people during this same time period, then that's relevant to her contentions that she's going to suffer emotional distress." The District added, "you can't separate that." The District pointed to the deposition testimony of their expert, Dr. Katz, who was asked, "So you're saying that victims of sexual abuse who had prior sexual experiences are less traumatized than those who haven't?" Dr. Katz responded, "They certainly can be."

The trial court denied plaintiff's motion in limine, ruling "I find that given the proffer on the defense that there will be expert testimony indicating that the extent of damages, if any, can be dependent upon other sexual relations that the plaintiff was having at the time is sufficient to raise—sufficient to raise a relevance to the issue of causation, as well as the issue of extent of damages suffered as a result of this sex with the teacher, as opposed to having sex with other individuals."

iii. *Analysis*

A trial court's ruling on the admissibility of evidence is reviewed for an abuse of discretion. (*Gordon v. Nissan Motor Co., Ltd.* (2009) 170 Cal.App.4th 1103, 1111.) However, a trial court abuses its discretion as a matter of law if its applies the wrong legal standard to the issue before it. (*Doe 2 v. Superior Court* (2005) 132 Cal.App.4th 1504, 1517.) That was the case here.

18

Here, the trial court did not weigh the prejudicial potential of the evidence against its probative value and did not make a finding of exceptional circumstances which would permit the use of plaintiff's sexual history or behavior at trial. Thus, the trial court abused its discretion.

The District and the trial court relied on the mere fact that plaintiff was claiming emotional distress damages to justify the use of the evidence. This is not sufficient, and moreover is clearly barred by the express language of Evidence Code section 1106, subdivision (a), prohibiting the use of prior sexual history evidence to prove the absence of injury to the plaintiff, with the exception of loss of consortium. As our Supreme Court has explained, "We cannot agree that the mere initiation of a sexual harassment suit, even with the rather extreme mental and emotional damage plaintiff claims to have suffered, functions to waive all her privacy interests, exposing her persona to the unfettered mental probing of defendants' expert." (*Vinson v. Superior Court* (1987) 43 Cal.3d 833, 841.)

The District and the court also relied on the deposition testimony of the District's expert to justify the use of the evidence. This is not sufficient. Dr. Katz testified at his deposition that "I don't know what [her] sexual history is. I don't know if she was ever raped before. I don't know if she had sex consensually, non-consensually. I don't know how often she has sex with how many different boys. And for me to understand the sexual trauma, I would like to know that." He also testified, "Here is what I'm saying, without knowing her past sexual history, I don't know how traumatized she was by the sexual acts that [were] perpetrated on [her in this case.]"

Dr. Katz's deposition testimony is remarkably similar to an expert declaration found insufficient by our colleagues in Division Two in *Knoettgen v. Superior Court, supra,* 224 Cal.App.3d 11. That declaration stated in pertinent part, "In order to conduct a meaningful evaluation of Plaintiff's alleged emotional damages, it is necessary to inquire into sexual assaults that Plaintiff may have suffered in the past. Such incidents are directly relevant to the issues of whether there is an alternative source of any emotional distress suffered by Plaintiff and the extent of damages Plaintiff allegedly has

19

suffered from the acts alleged in her Complaint." (*Id*. at p. 14.) The court concluded that this showing did not differentiate the case before it from any other sexual harassment case. (*Ibid*.) We reach the same conclusion in this case.

Dr. Katz simply testified that past sexual history is relevant to understanding the extent of plaintiff's sexual trauma. This is true in every case. It does not show exceptional circumstances which would allow the introduction of plaintiff's sexual history.

iv. *Waiver*

The District claims that even if the trial court erred in ruling that evidence of plaintiff's sexuality was admissible, plaintiff reasserted her claims of damage to her sexuality at the beginning of trial, thus opening the door to evidence on that topic.

"'[A] motion in limine to exclude evidence is a sufficient manifestation of objection to protect the record on appeal when it satisfied the basic requirements of Evidence Code section 353, i. e.: (1) a specific legal ground for exclusion is advanced and subsequently raised on appeal; (2) the motion is directed to a particular, identifiable body of evidence; and (3) the motion is made at a time before or during trial when the trial judge can determine the evidentiary question in its appropriate context.' (*People v. Morris* (1991) 53 Cal.3d 152, 190, disapproved on another ground by *People v. Stansbury* (1995) 9 Cal.4th 824, 830, fn. 1.)" (*Boston v. Penny Lane Centers, Inc.* (2009) 170 Cal.App.4th 936, 950.) Even if plaintiff addressed damages to her sexuality at trial, she was permitted to do so without waiving her objections to that evidence under the "defensive acts" doctrine which permits a party to introduce evidence she has previously unsuccessfully objected to, in an attempt to preemptively address the evidence. (*People v. Scott* (1978) 21 Cal.3d 284, 291.)

v. *Prejudice*

"There can be no doubt that allowing a jury to hear evidence of unsavory conduct can be reversible error due to its prejudicial effect." (*People v. Paniagua* (2012) 209 Cal.App.4th 499, 519-520; *Winfred D. v. Michelin North America, Inc.* (2008) 165 Cal.App.4th 1011, 1026, 1029.)

The Legislature clearly recognized that a plaintiff's sexual history had significant potential for prejudice. (*Knoettgen v. Superior Court, supra*, 224 Cal.App.3d at pp. 13-14.) There is ample evidence that the prejudicial potential was realized. The jury asked a significant number of questions about plaintiff's sexual history which indicated an improper and irrelevant interest in the topic.

Jurors sent a note during Dr. Friedland's testimony stating, "there appears to be an inconsistency. Andy was an 8th grade boy, left middle school in fall of 2010. She was two years younger, so she should be in 7th grade in the fall of 2010. The attorney said she was in 8th grade." The juror then clarified, "I just wanted to know what grade she was in while she was having—what grade was that?" When Dr. Friedland suggested that plaintiff was in 8th grade in 2010, the juror replied, "It doesn't make sense. If he's two years older and was going to 9th grade, she would have been in 7th. The attorney said 8th, so I'm just confused."

While plaintiff was testifying, a juror sent a note asking, "Is [plaintiff] planning to go to back to . . . Hermida after turning 18; and . . . how old was she when she first starting having sex?"

A juror also sent a note posing a series of questions to be asked of plaintiff: "Did you have a boyfriend and you started texting back and forth [with Hermida]?" "Did you have a boyfriend at any point during the relationship with . . . Hermida?" "Did you tell your friend when he first . . . sen[t] you a friend request through myspace?" "Have you had sex with other boys before having sex with . . . Hermida?" This line of questioning by the jurors was not admissible.

21

The District then exacerbated the prejudice by using plaintiff's relationships with boys to argue that she was sophisticated and could, in effect, voluntarily consent to sex with Hermida. They argued during closing: "And no matter what you say about her mind being overcome, from some reason, by Hermida, Hermida wasn't in her classroom. That was a decision she made. And what did [her friend] Andromeda tell you about plaintiff coming back from one of those episodes? Coming back into the classroom after having met with Hermida and had some sexual acts occur. Me and Hermida just had a quickie. A quickie. [¶] And at first she tried to act like she didn't know what it was, and then she acknowledged what it was. Now, a quickie, is that a language or thought process of a naïve person, a person that doesn't know what's going on, a quickie?"

Although evidence of plaintiff's sexual history was purportedly offered only on the issue of damages, her history was discussed throughout the trial. This evidence and argument about it is highly prejudicial and warrants reversal even considered in isolation. That prejudice is only heightened when the presentation of plaintiff's sexual history is contrasted with the District's refrain that there was no evidence that Hermida had committed prior acts of sexual misconduct, which had the unfortunate effect of making plaintiff look in some ways more sophisticated than her abuser.

There is a reasonable chance that the jury would have reached a more favorable result for plaintiff in the absence of evidence of her sexual history. Reversal is required.

c. *Comparative Fault and Consent*

Plaintiff contends the trial court erred in instructing the jury that the District "claims that [plaintiff's] own wrongful conduct contributed to her harm" and if the District proves this claim, plaintiff's "damages are reduced by your determination of the percentage of [plaintiff's] responsibility." She further contends that the trial court erred in permitting the District to argue that her wrongful conduct was consenting to the sex.

22

i. *Comparative negligence or fault*

We agree that the trial court erred in instructing the jury on comparative fault for two reasons: (1) there was no evidence of any wrongful conduct by plaintiff, and (2) comparative fault has no application in a case involving the sexual abuse of a minor student by an adult teacher in a position of authority in a public school setting.

Hermida's sexual abuse of plaintiff began while she was under the protection of the District, which stands in loco parentis to all of its students, including plaintiff. Criminal law prohibited the sexual acts committed by Hermida in order to protect minors like plaintiff who, due to a lack of mature judgment, might be manipulated into sexual activity with a predatory adult. The District nevertheless sought in the trial of this matter to deprive plaintiff of the protections afforded her by criminal and civil law; the District convinced the trial court that minors can consent to sex with adults and so the law imposing responsibility on minors in other contexts should be expanded to the school setting to impose responsibility on minor students for their own sexual abuse by teachers.[3] On appeal, the District continues to maintain that a minor student who is the victim of sexual abuse by a teacher bears responsibility for preventing that abuse. The District was wrong in the trial court and is wrong now. There is no case or statutory authority or persuasive reasoning supporting the notion that students sexually victimized by their teachers can be contributorily responsible for the harm they suffer.

---

[3]     In agreeing to give the instructions requested by the District, the trial court relied primarily on *Sagadin v. Ripper* (1985) 175 Cal.App.3d 1141 (*Sagadin*), which involves liability for the illegal serving of alcohol to minors by social hosts in a private home. The trial court was mistaken in so relying. "[S]chool grounds provide a different setting than an adult's home. And there are differing public policy concerns related to the responsibilities of school districts that provide mandatory education as compared to adults who invite children into their home on a voluntary basis." (*M.W. v. Panama Buena Vista Union School Dist.* (2003) 110 Cal.App.4th 508, 524.) Further, in *Sagadin*, "the claimed negligence of the [social hosts] was predicated solely on the violation of . . . a penal statute." (*Sagadin, supra*, 175 Cal.App.3d at p. 1163.) In this case, the claimed negligence of the District is predicated on the special relationship between plaintiff, a pupil in the District, and defendant, a school district.

23

The District's theory of comparative fault was based on its claim that plaintiff engaged in wrongful conduct by "consenting" to sex with Hermida, and so could be held responsible for the harm she suffered from that abuse.

As the California Supreme Court has made clear in its discussion of minors as the victims of sex crimes, the minor is wronged by the adult's conduct even if she "consents" to the sexual relationship. (*People v. Tobias* (2001) 25 Cal.4th 327 (*Tobias*).) As the court stated, "'It has long been settled that where a penal statute expressly outlaws conduct against minors, a minor who is a victim of the proscribed conduct is not an accomplice. . . . '" The court explained, "The rationale underlying this rule is that prosecution of the minor for cooperating with the defendant would be inconsistent with the purpose of the law, which is to protect the minor. . . . [T]*he minor, even if a willing participant in the defendant's conduct, is a victim. . . .* " (*Id*. at p. 334, italics added.) "[T]he law. . . puts the burden *on the adult* to avoid the sexual relationship." (*Id*. at p. 337, italics added.)

This burden falls with particular force on a school district. It is well settled that "a school district and its employees have a special relationship with the district's pupils, a relationship arising from the mandatory character of school attendance and the comprehensive control over students exercised by school personnel, 'analogous in many ways to the relationship between parents and their children.' [Citations.]" (*C.A., supra,* 53 Cal.4th at pp. 869-870.) Because of this special relationship, a school district has obligations to its pupils "beyond what each person generally owes others under Civil Code section 1714."[4] (*Id*. at p. 870.)

As relevant here, a school district has "a duty of supervision that include[s] an obligation to offer [a student] some protection against her own lack of mature judgment."

---

[4] Civil Code section 1714, subdivision (a) provides in pertinent part, "Everyone is responsible, not only for the result of his or her willful acts, but also for an injury occasioned to another by his or her want of ordinary care or skill in the management of his or her property or person, except so far as the latter has, willfully or by want of ordinary care, brought the injury upon himself or herself."

24

(*Kahn v. East Side Union High School Dist.* (2003) 31 Cal.4th 990, 1017 (*Kahn*).) Such supervision is necessary because of the "commonly known tendency of students to engage in . . . impulsive behavior which exposes them . . . to the risk of serious physical harm." (*Dailey v. Los Angeles Unified School Dist.* (1970) 2 Cal.3d 741, 748.) Thus, plaintiff's lack of mature judgment in "cooperating" with her abuser was a source of the District's responsibility to her, not a partial excuse from that responsibility. Plaintiff cannot be held partially responsible for the sexual abuse committed on her by Hermida, an adult teacher.

ii. *Consent*

The trial court instructed the jury that there is no age of consent and that a minor is capable of giving legal consent to sexual intercourse. This instruction was incorrect under the circumstances of this case, which involve the sexual abuse of a minor by an adult in a position of authority.

Hermida pled no contest to committing a lewd or lascivious act on child aged 14 or 15 in violation of section 288, subdivision (c)(1). As the standard jury instructions for this crime show, it is not a defense that the child may have consented to the act. (CALCRIM No. 1112; CALJIC No. 10.41; CALJIC No. 10.42.5)[5] It was also undisputed at trial that Hermida had sexual intercourse with plaintiff, which violated section 261.5. Consent is also not a defense to that offense. Thus, Hermida is a criminal, even if plaintiff consented to his sexual acts.

At the same time, plaintiff is the victim of a crime, even if she consented to Hermida's acts. As we discuss above, the California Supreme Court has made clear in its discussion of minors as the victims of sex crimes that the minor is wronged by the adult's

---

[5]     CALJIC No. 10.41 applies to violations of section 288, subdivision (a) and provides that consent is not a defense. The use note to CALJIC No. 10.42.5 provides that instructions and case law concerning section 288, subdivision (a) applies to violations of section 288, subdivision (c) as well.

25

conduct even if she "consents" to the sexual relationship. (*Tobias, supra,* 25 Cal.4th 327.)

The victim of a crime does not bear any responsibility for the harm she suffers from the crime. Thus, a minor's purported consent to a crime is simply not relevant in a tort action against a school district for damages arising from the sexual abuse of a minor by a teacher. Specifically, in this case, plaintiff's purported consent to Hermida's crimes is not in any way relevant to the issue of whether the District negligently supervised Hermida, or to whether she suffered damages as a result of that supervision.

Despite this clear lack of relevance of consent, the trial court instructed the jury that "There is no 'age of consent' with regard to sexual relations involving a minor. A minor is capable of giving legal consent to sexual intercourse unless said minor has such a high degree of immaturity that the minor could not meaningfully agree to engage in the sexual conduct in question." The court said, "I believe it is a correct statement of law, as this was taken directly from the *Donaldson* case." The court was referring to *Donaldson v. Department of Real Estate* (2005) 134 Cal.App.4th 948 (*Donaldson*).[6] Although *Donaldson* is a civil case, the *Donaldson* court's discussion of "consent" is taken from the criminal law. However, the *Donaldson* court simply missed the bigger picture concerning consent in criminal law, as did the trial court in this case.

Generally, consent is a very limited concept in sex crimes against a minor. The court in *Donaldson* relied on the discussion of consent in *Tobias, supra,* 25 Cal.4th 327, which involved the very narrow topic of consent in the crime of incest in which one participant is a minor. Incest is a unique crime, in that both participants can be criminally prosecuted if they consent to the act, and the statute, as written, does not make a clear

---

[6]     The issue before the court in *Donaldson* was the narrow one of whether a violation of section 261.5 was a sex crime involving "a non-consenting participant" within the meaning of a statute authorizing the revocation of a real estate license. The court found that since absence of consent was not an element of a section 261.5 offense, a finding that a licensee violated section 261.5 did not prove that the licensee had had sex with a non-consenting participant.

26

distinction between adult participants and participants who are minors aged 14 or older. (§ 285.) Thus, the *Tobias* court's discussion of consent is not readily applicable to other sex crimes.

At the same time that the *Donaldson* court relied on the consent discussion in *Tobias*, it overlooked that opinion's general discussion of the role of minors as victims in sex crimes. This more general discussion is applicable to sex crimes other than incest. As we have discussed above, the opinion in *Tobias* shows that even if a minor consents to sexual activity with an adult, he or she is still the victim of the crime. Thus, the trial court erred in instructing the jury on consent.[7]

### iii. *Prejudice*

Although the issue of comparative fault was purportedly offered only on the issue of damages, the idea that plaintiff engaged in wrongful conduct was discussed throughout the trial. The idea that plaintiff engaged in wrongful conduct by "consenting" to sexual intercourse wrongly portrayed her in a negative light and was highly prejudicial. There is a reasonable chance that the jury would have reached a more favorable result for plaintiff in the absence of evidence that she engaged in wrongful conduct, particularly wrongful conduct in "consenting" to sexual intercourse with her teacher. Reversal is required.

### d. *Superseding Cause Instruction*

Plaintiff contends the trial court erred by instructing the jury pursuant to CACI No. 433 that the District was "not responsible for [plaintiff's] harm if [the] District

---

[7] Although there may have been some confusion about the applicability of the criminal law concept of "consent" to civil cases at the time of the trial in this matter, the Legislature has since added section 1708.5.5 to the Civil Code to clarify that "consent" is not a defense in civil law actions for sexual battery involving a minor victim and an adult who is in a position of authority over the minor, including teachers. The Legislature has also amended Evidence Code section 1106 to provide that "evidence of the plaintiff minor's sexual conduct with the defendant adult [shall not be] admissible to prove consent by the plaintiff or the absence of injury to the plaintiff." (Stats. 2015, ch. 128.)

proves both of the following: [¶] 1. That the criminal conduct of . . . Hermida happened after the conduct of [the] District; and [¶] 2. That [the] District did not know and could not reasonably foreseen that another person would be likely to take advantage of the situation created by [the] District's conduct to commit this type of act." We agree.

"It is well established that when a defendant's negligence is based upon his or her having exposed the plaintiff to an unreasonable risk of harm from the actions of others, the occurrence of the type of conduct against which the defendant had a duty to protect the plaintiff cannot properly constitute a superseding cause that completely relieves the defendant of any responsibility for the plaintiff's injuries." (*Lugtu v. California Highway Patrol* (2001) 26 Cal.4th 703, 725; accord *Kahn, supra,* 31 Cal.4th at p. 1017.)

There was no dispute that the District's Code of Conduct was designed in part to protect students from sexual abuse by teachers. As we discuss throughout this opinion, sex by an adult with a minor is always a crime. Thus, the fact that Hermida committed a sex crime is not a superseding cause.

e. *Discretionary Immunity Instruction*

Plaintiff contends the trial court erred in instructing the jury that "Decisions by a school principal to impose discipline on a teacher require the exercise of judgment and choice, and accordingly are discretionary acts for which defendant . . . is immune from liability." Plaintiff has not cited any objection in the trial court and did not offer any legal or factual argument in her opening brief to support her claim. Accordingly, she has waived this claim on appeal. (*Paulus v. Bob Lynch Ford, Inc.* (2006) 139 Cal.App.4th 659, 685.)

We note that in her reply brief, plaintiff contends that the instruction is erroneous because it might have caused the jury to mistakenly believe that a school principal's decision to *investigate* claims of potential misconduct is discretionary although plaintiff claims such investigation was mandatory under the District policy. Although we do not

28

consider this argument on appeal (*Reichardt v. Hoffman* (1997) 52 Cal.App.4th 754, 764), plaintiff is free to make this argument on remand.

DISPOSITION

The judgment is reversed and matter is remanded for a new trial. Plaintiff, S.M., shall recover costs on appeal.

**<u>CERTIFIED FOR PUBLICATION</u>**

KIRSCHNER, J.[*]

I concur:

KRIEGLER, J.

---

[*] Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

S.M. v. Los Angeles Unified School District

B253983

TURNER, P.J., Concurring

I concur in the decision to reverse the judgment. I respectfully disagree though that there was properly preserved prejudicial instructional error in connection with CACI No. 426. The tort of negligent supervision involves a special application of negligence rules. (Rest.2d Agency § 213, com. a; see *Schovanec v. Archdiocese of Oklahoma City* (Okla. 2008) 188 P.3d 158, 169, fn. 12.) In terms of negligent retention, there must be knowledge of the *particular risk or hazard* that causes injury. (*Doe v. Capital Cities* (1996) 50 Cal.App.4th 1038, 1054 ["Liability is based upon the facts that the employer knew or should have known that hiring the employee created a particular risk or hazard and that particular harm materializes."]; *Evan F. v. Hughson United Methodist Church* (1992) 8 Cal.App.4th 828, 836-837 [the cornerstone of the religious conference's liability of negligent hiring was "the risk that [the molester] will act in a certain way (i.e., molest a child). . . ."]; see Rest.2d, *supra,* § 213, com. d ["[T]here is liability only to the extent that the harm is caused by the quality of the employee which the employer had reason to suppose would be likely to cause harm."]; see Chin et al., Cal. Practice Guide: Employment Litigation (Rutter Group 2014) ¶ 5:832, p. 5(I)-86.) In *Diaz v. Carmarco* (2011) 51 Cal.4th 1148, 1157, our Supreme Court analyzed a negligent retention claim in the context of an accident prone truck driver. In doing so, our Supreme Court defined the relevant negligent retention claim as follows: "Awareness, constructive or actual, that a person is unfit or incompetent to drive underlies a claim that an employer was negligent in hiring or retaining that person as a driver. (See Judicial Council of Cal. Civ. Jury Instns. (2010) CACI No. 426.)" (*Diaz v. Carcamo, supra,* 51 Cal.4th at p. 1157.) Thus, defendant was entitled to an instruction focusing the jurors' attention on the relevant knowledge element—the risk Elkis Hermidia would sexually abuse a student.

Plaintiff argues that CACI No. 426 should have been given without modifying it to refer to defendant's knowledge of Mr. Hermidia's propensity or potential to abuse a child. This contention as no merit. For example, there was evidence of Mr. Hermidia's unprofessionalism, laying on his back on his desk texting. The jurors could reasonably have concluded that level of *unprofessionalism* should have evinced some response from Mr. Hermidia's colleagues and his supervisors; instead of institutional silence. On the other hand, the jurors could have deduced such conduct in the presence of female students was evidence of a *propensity to engage in sexual misconduct* when coupled with other evidence. The instruction selected by the trial court directed the jury at the critical issue—whether the conduct of which defendant was aware of should have been triggered appropriate correction action.

Plaintiff never asserted in the trial court any modification should be made to CACI No. 426. This is not a case where there was a complete failure to instruct on a cause of action. The position plaintiff took, that modification to CACI No. 426 was unwarranted, is without merit. Thus, any issue concerning using the phrase "potential" to sexually abuse minors rather than the "dangerous propensity" verbiage has been forfeited. (*Agarwal v. Johnson* (1979) 25 Cal.3d 932, 951; *Scofield v. Critical Air Medicine* (1996) 45 Cal.App.4th 990, 1011.) And even if the language "dangerous propensity" to sexually abuse minors should have been replaced with the "potential" adjective, there is no reasonable probability of a different result. (*Cassim v. Allstate Co.* (2004) 33 Cal.4th 780, 800; Cal. Const., art. VI, § 13.) However, I join in my colleagues' well-stated discussion of the other errors which do, for the reasons stated, warrant reversal of the judgment.


TURNER, P. J.


2